J. G. LAKENAN, Appellant, v. NORTH MISSOURI TRUST COMPANY, Respondent.

St. Louis Court of Appeals, February 21, 1910.

1. PRINCIPAL AND SURETY: Duty of Creditor: Applying Proceeds of Property Mortgaged to Secure Debt.   Where the maker of a note gave a mortgage on cattle to secure the same and after selling the cattle turned the proceeds over to the creditor, if the latter knew the money turned over to him was the proceeds of the mortgaged property, he owed the duty to one who signed the note as surety to apply the whole amount toward paying the note, instead of turning a portion of it over to the maker, as the latter course would deprive the surety of his right in equity to subrogation.

2. ——: ——: Preserving Liens.   A creditor must act in good faith and with reasonable diligence to preserve for the benefit of a surety liens held on the principal debtor's property.

3. ———: ———: **May not Release Collateral Security.** While a creditor is not bound, in the absence of a statute compelling action, to enforce a lien held on the principal's property, without discharging the surety, he may not release means in his hands to discharge the debt, and still hold the surety.

4. ———: ———: ———: **Constructive Notice.** When a creditor, who has released a lien on property of the principal, seeks nevertheless to hold the surety responsible on the ground the creditor released in ignorance of the surety's right to look to the lien for indemnity, the surety cannot be held if the creditor was apprised of such minor facts as would have induced a prudent man to inquire about the main facts, and inquiry would have ascertained the truth as to the surety's right to look to such lien for indemnity.

5. ———: ———: ———: ———: **Case Stated.** Wilkins executed a note secured by a mortgage on cattle to a trust company and thereafter sold the cattle and deposited the proceeds in a bank to the credit and subject to the order of the trust company, the trust company being notified of such fact. The trust company drew a draft for the proceeds of the sale, which was duly paid, and immediately thereafter the trust company credited Wilkins with the amount thereof. Part of this amount was paid to Wilkins and the balance credited on said note. Wilkins was not a general customer of the trust company and had not been in the habit of making any deposits with it, except when he borrowed money from it. He made no request that the money be placed to his credit, but had it deposited to the trust company's credit. An account rendered to the trust company by the commission company covering the sale showed the sale was of the exact number of cattle covered by the mortgage, less one which had died. *Held,* that the officers of said trust company were apprised of facts which would have led men of common prudence to inquire whether the money represented the price of the mortgaged cattle and thus have elicited the truth, and that the trust company should have applied the entire proceeds of the sale as a credit on the note and thereby have protected a surety on the note.

6. ———: ———: ———: **Sale of Property Mortgaged to Secure Debt: Knowledge of Surety.** Neither the fact that a surety had knowledge that property mortgaged to secure the debt was sold nor that part of the proceeds of the sale was used to liquidate an indebtedness owing by the principal debtor to him would affect his right to hold the creditor responsible from paying the proceeds to the principal debtor, instead of devoting it toward payment of the debt.

147 App—4

Appeal from Audrain Circuit Court.—*Hon. James D. Barnett,* Judge.

REVERSED AND REMANDED (*with directions*).

*Clarence A. Barnes* for appellant.

(1) Plaintiff lost the value of $1493.02 as security by the negligence or design of defendants North Missouri Trust Company and J. C. Mundy and as surety on the note involved in this suit is dicharged to that extent from liability thereon. Murrell v. Scott, 51 Tex. 520; Bank v. Bartle, 114 Mo. 276; Bank v. Kilpatrick, 204 Mo. 119; Taylor v. Jeter, 23 Mo. 244; 1 Brandt on Securityship and Guaranty (3 Ed.), p. 934, sec. 498. (2) If the creditor has the means of satisfaction from the property of the principal in his power and fails to avail himself of it, the surety is discharged. Clom to use v. Coal Co., 98 Pa. St. Rep. 432; Bank v. Thompson Grants Cas. (Pa.); Dawson v. Bank, 5 Ark. (5 Pike) 283; Molka v. Ins. Co., 29 Pa. Super. Ct. 149; Perrine v. Ins. Co., 22 Ala. 575; Hurd v. Spencer, 40 Vt. 410; Kiam v. Cummings, 13 Tex. Civ. App. 198; Joyce on Defenses to Commercial Paper, sec. 613, p. 768; Phares v. Barbour, 49 Ill. 370; Kirkpatrick v. Howk, 80 Ill. 122; Stewart v. Davis' Ex'r, 18 Ind. 74; Hayes v. Ward, 4 Johns Ch. 123, 8 Am. Dec. 554; Pierce v. Atwood, 89 N. W. 669; Lowe v. Reddan, 100 N. W. 1038; Frost v. Wilson, 2 Am. Law J. 260, 2d Series, Vol. 9 Am. L. J.; Ramsey v. Bank, 2 Pen & Watts (Pa.) 203; Richards v. Commonwealth, 40 Pa. 146; Gillespie v. Darwin, 6 Heisk (Tenn.) 21.

*Robertson & Robertson* for respondents.

(1) Applying the rule in equity cases that the finding of the chancellor will be deferred to by the appellate court determines this case in favor of an affirmance of the judgment of the trial court. Snell v.

Harrison, 83 Mo. 651; Sharpe v. McPike, 62 Mo. 300; Hodges v. Black, 76 Mo. 537; Royle v. Jones, 78 Mo. 403; Broughton v. Brand, 94 Mo. 160; Erskine v. Lowenstein, 82 Mo. 301; Hard v. Foster, 98 Mo. 297; Benne v. Schnecko, 100 Mo. 250; Roberts v. Stone, 99 Mo. App. 432; Mining Co. v. Mining Co., 106 Mo. App. 66.     (2) The failure of the plaintiff, Lakenan, to take the witness stand when Wilkins had testified that Lakenan was familiar with his stock, knew of the shipment of these cattle and knowingly accepted a check for part of the proceeds from the sale of the cattle and after Mr. Pollock had testified that Mr. Lakenan gave the trust company the first information it had of the shipment of the cattle long after such shipment, must be treated as an admission on the part of the plaintiff of this evidence.     He must therefore stand convicted of the knowledge that the security in the chattel mortgage was being gotten away from the trust company, and is now precluded from the complaint made in his petition. Wigmore on Evidence, sec. 289; Bank v. Levy, 106 La. 586; Baldwin v. Whitecomb, 71 Mo. 651; Goldsby v. Johnson, 82 Mo. 602; Werner v. Litzsinger, 45 Mo. App. 106; Ins. Co. v. Smith, 117 Mo. 261; Stephenson v. Kilpatrick, 166 Mo. 262.     (3) The note was not due August 18th.     Neither by the terms of the mortgage nor the note did it become due until default in the payment.     The disposal of the property gave the mortgagee the right to take possession of it, but that disposal would not change the obligation it was given to secure.     Even if the note had been due for any reason, the trust company was under no obligation so far as this plaintiff is concerned to apply Wilkins' deposit to the payment of the note.     Bank v. Booze, 75 Mo. App. 189; Harburg v. Kumpf, 151 Mo. 16; Insurance Co. v. Landis, 50 Mo. App. 116; English v. Siebert, 49 Mo. App. 563; Barnes v. Mowery, 129 Ind. 568; Bank v. Peck, 127 Mass. 298; Bank v. Lilliard, 55 Mo. App. 675.

GOODE, J.—On July 2, 1904, defendant James H. Wilkins made and delivered to defendant James C. Mundy a promissory note for $3928, due ninety days after date, drawing interest at the rate of eight per cent per annum, and signed by said Wilkins as principal and by plaintiff, Lakenan, as surety. The latter put the word "security" after his name to show the capacity in which he signed. James C. Mundy, the payee of the note, was at the time an officer of the North Missouri Trust Company, the trust company was the real party in interest in the transaction and Mundy at once transferred to it the note, which was executed to take up two earlier notes made by Wilkins to said company. One of the earlier notes was for $3000 and secured like the one in suit by a chattel mortgage on sixty head of cattle belonging to Wilkins. The money obtained on the note for $3000 was used, in the main, by Wilkins to buy cattle, and the money obtained on the earlier note for $700 was used to buy feed for the cattle. The note in controversy was secured by a chattel mortgage on sixty-one head of cattle belonging to Wilkins. This mortgage, which was executed simultaneously with the note, stipulated that Lakenan should sign the note as security, the cattle should remain on the farm in Audrain county where they were and ready to be exhibited to the mortgagee on demand, they should remain in the possession of Wilkins until default was made in payment of the debt, and interest, or some part thereof, but in case of disposal or attempt to dispose of them, or removal of them, or attempt to remove them, from the county, the mortgagee might take possession and sell at public auction to the highest bidder for cash. On August 16, 1904, and six weeks before the note fell due, Wilkins shipped the cattle to the Bowles Live Stock Commission Company, at the Union Stockyards in Chicago, to be sold, and accompanied the shipment. They were sold by said Commission Company and realized net $3446.02. Wilkins, in writing, directed the

Bowles Commission Company to deposit this money, less $25, which he drew in cash, to the credit of the North Missouri Trust Company and subject to its order, in the National Live Stock Bank of Chicago. Pursuant to Wilkins' order the commission company deposited the proceeds, less $25, or $3421.02, in said Chicago bank to the credit of the North Missouri Trust Company, and subject to its order. The direction given by the Bowles Commission Company to the National Live Stock Bank about the disposition of the money was in a writing purporting to be signed by Wilkins by the commisson company as his agent, and said there was handed to the bank $3421.02, to be placed to the credit of the North Missouri Trust Company, of Mexico, Missouri, subject to its order. The sale of the cattle in Chicago and the deposit of the proceeds to the trust company's credit, happened August 17th, and a letter was sent by the bank to the trust company on said day, notifying the latter of what had happened. This letter is not in the record nor are its precise contents shown. Mundy, the secretary of the trust company, testified he did not remember whether a letter of advice was received also from the Bowles Commission Company. The following document is in the record without any proof, further than appears on its face, that a copy of it was sent to the trust company. It was attached to the deposition of the secretary of the Bowles Commission Company, as a memorandum showing the sale of Wilkins' cattle, and as will be perceived at the bottom has the trust company's name and address, as though it was a report made to said company.

"Chicago, August 17, 1904.

Sold for account of J. H. Wilkins; P. O. Mexico, Mo.; No. 1 shipped from Mexico, Mo.

| Purchaser. | Cattle. | Price. | Amount. | |
|---|---|---|---|---|
| Armour | 51 strs | 5.20 | 3165.24 | |
| Ulmer P. C. | 9 strs | 4.40 | 459.80 | |
| U. P. C. | 1 Dd chute | | 5.00 | |
| | | | | 3630.04 |

| Car No. | R. R. Weight. | Rate. |
|---|---|---|
| 28081 | 23500 | 18.5 |
| 2238 | 22300 | " |
| 3450 | 24000 | " |

| Charges. | | | |
|---|---|---|---|
| Freight, including terminal | 135.12 | | |
| Yardage | 15.25 | | |
| Hay | 3.15 | 153.52 | |
| Commission | | 30.50 | 184.02 |
| Net Proceeds | | | 3446.02 |
| Cash | | | 25.00 |
| | | | 3421.02 |

Anything not satisfactory please call for explanation.
North Missouri Trust Co.,
        Mexico, Mo."

The witness said the document attached to his deposition was a copy of one rendered August 17th, without saying to whom it was rendered. After being advised this money had been put to its credit in the National Live Stock Bank at Chicago and was subject to its order, the North Missouri Trust Company drew a draft on said bank in favor of the Illinois Trust & Savings Bank, which was the Chicago Bank wherein the trust company kept an account. That draft was paid by the National Live Stock Bank at Chicago to the Illinois Trust & Savings Bank and was placed by the latter to the credit of the North Missouri Trust Company. Mundy testified that on August 18th, and before the trust company was opened for the day's business, he received the letter of the National Live Stock

Bank stating the deposit had been made therein to the credit of the trust company, by order of Wilkins, and at once gave Wilkins credit on the books of the trust company for the amount, as he understood it was his money. Wilkins left for home on August 17th, on the 18th visited the trust company in Mexico, Missouri, and, as he says, asked Mundy if the company had had returns from the cattle and the latter said returns had been received. Wilkins then told him the money was the proceeds of the cattle on which the trust company held a mortgage; that he would like to borrow enough money from said company to pay off the note of $3928, which was secured by the mortgage, and leave him about $1500 over. The effect of Wilkins' testimony is that he asked this loan on the security of a chattel mortgage to be given on stock owned by him; that Mundy and Pollock, another officer of the trust company, talked the matter over and then said instead of making a new loan, they would mark the note in suit down to $2000, would credit it with enough of the proceeds of the cattle to reduce it to $2000, thereby leaving Wilkins the remainder of the proceeds, or about $1500; also would extend the note as thus reduced. We should state that, according to the terms of the note, an extension could be granted without notice to Lakenan as surety, who would still remain bound. An indorsement on the back of the note shows it was marked on August 18th with a credit of $1928, leaving a balance due of $2000. Subsequently Wilkins paid $84.89 interest, and on February 25, 1905, the note was extended for four months more. Mundy testified the officers of the trust company did not know the money put to their credit in the National Live Stock Bank in Chicago was the proceeds of the cattle on which they held a mortgage, and Wilkins did not tell them it was. As to this matter there is a conflict in the evidence. Mundy said he and Pollock thought as the Wilkins note to the trust company did not mature until October, the money was the

proceeds of other cattle shipped by Wilkins, who was entitled to dispose of it as he pleased; that he made no inquiry of Wilkins about the matter, as stock shippers who did business with the trust company were accustomed when they sold stock in city markets, to have the proceeds put to the company's credit in some bank where the sale occurred, and the company would give the shipper credit on its books for the amount as soon as it was advised of the deposit to its credit in the city bank. Munday testified Wilkins said nothing of the money in question being the proceeds of the mortgaged cattle, or of wishing to borrow to pay off his note; but only said he wanted to pay the note down to $2000, which he did by drawing a check against his deposit account; that he checked out the balance of the account later. Subsequently the trust company made a demand on Lakenan, as security, for the balance, and he refused to pay it; Pollock says, on the ground he had been released by the extension of the note, though he mentioned, too, the shipment and sale of the cattle and said he thought the trust company was aware of those facts at the time. The present action is in the nature of a bill in equity filed by Lakenan, alleging, among other things, the shipment and sale of the cattle by Wilkins, without Lakenan's knowledge, and the omission of the trust company, with full knowledge of the facts, to apply the entire proceeds toward satisfaction of the note on which Lakenan was security; alleging further the trust company only credited the note with $1928 and the remainder, or $1492.02, was negligently and willfully lent to Wilkins, who was at the time and still is, insolvent. Plaintiff tendered $493, which would be the balance due on the note if the entire proceeds of the cattle had been applied toward paying it, and prayed the note be cancelled and surrendered to him. The answer of Mundy and the trust company, after admitting various statements of the petition, and setting out the provisions of the chattel mortgage, alleged there was no

agreement, express or otherwise, with plaintiff that he was to be liable as security on the note or only to the extent the cattle should fail to pay it, if Wilkins did not pay it; denied the trust company accepted plaintiff as additional security and alleged it accepted him according to the terms of the note as one of the principals and responsible for the whole amount; then alleged the trust company had no knowledge or information at the time it disposed of the proceeds of the cattle as has been stated, that said proceeds had arisen from the sale of cattle mortgaged to the trust company, and in truth never learned this until plaintiff told it long afterwards. In connection with the answer a counterclaim was set up for the balance of $2000 alleged by the trust company to be due on the note, with interest from February 25, 1905. The answer of Wilkins was a general denial of the averments of the petition. A replication was filed by plaintiff setting out various matters which need not be recited, as they are but repetitions of what has already been stated. The replication, like the original petition, averred plaintiff signed the note as additional security, for the accommodation of Wilkins, and charged that on August 18, 1904, Wilkins paid to the trust company on said note the sum of $3421.02, or the full amount realized by selling the cattle. Evidence was given tending to prove Wilkins was insolvent at the dates in question; that Lakenan saw him driving the cattle through the city of Mexico for shipment and talked with him, but the evidence was not direct that Lakenan knew the cattle were those mortgaged to the trust company. The proof showed Wilkins commonly did business with the Mexico Savings Bank and not with the trust company, and though his account with the latter was introduced to prove the contrary, it did not extend back of December, 1903, the date of the original $3000 loan to him. Proof was made that Wilkins drew two or three checks on his account in the trust company in favor of Lakenan to

pay rent and others items, after the proceeds of the cattle had been credited to Wilkins.

The court found the issues for the trust company and dismissed plaintiff's bill; further finding the issues on the counterclaim in favor of the trust company and entering judgment against plaintiff on the counterclaim for $2303.39. After appropriate motions, plaintiff appealed.

If the trust company knew the money which Wilkins had caused to be put into its hands was the proceeds of the very cattle on which it held the mortgage, then Lakenan's right to be released from payment of so much of the note as would have been satisfied by applying the entire proceeds toward its satisfaction, is not gainsaid. Though something is said in the answer about Lakenan having signed the note as principal, this averment was refuted by both the note itself and the mortgage, which showed he signed as surety, and the contention to the contrary has not been insisted on by counsel for the trust company. Their position on the appeal is that the trust company did not know the money deposited to its credit and subject to its order, in the National Live Stock Bank of Chicago, pursuant to the order given by Wilkins to the Bowles Commission Company, had been obtained by selling the cattle embraced in the mortgage to the trust company. If the trust company knew the facts, then inasmuch as it had in its hands the proceeds of the mortgaged property, which Wilkins had had deposited to the company's credit because of its lien on the cattle, the company owed the duty to Lakenan to apply the whole amount toward paying the note, instead of turning over a portion of it to Wilkins, as the latter course would deprive Lakenan of his right in equity to proceed by way of subrogation to enforce the mortgage in case he was compelled to pay the debt. A creditor must act in good faith and with reasonable diligence to preserve for the

benefit of a surety, liens held on the principal debtor's property. [1 Brandt, Suretyship (3 Ed.), sec. 500; 27 Ency. Law (2 Ed.), pp. 576 *et seq*; Ferguson v. Turner, 7 Mo. 497; Rice v. Morton, 19 Mo. 263, 280; State Bank v. Bartle, 114 Mo. 276; Plankinton v. Gorman, 93 Wis. 250; City Bank v. Young, 43 N. H. 457.] The creditor may not be bound, in order to protect a surety, to proceed against a collateral security given by the principal, and if it happens a bank is the creditor, it may not be bound to apply a general deposit belonging to the principal debtor in payment of his debt. [Citizens Bank v. Booze, 75 Mo. 189.] But the creditor's privilege to remain passive (in the absence of some statute compelling action, like ours compelling him to sue on demand of the surety), as regards enforcing a lien held on the principal's property, without discharging the surety, does not extend so far as to allow the creditor to release means in his hands to discharge the debt, for instance, a mortgage lien, and still hold the surety. The case of Rice v. Morton, supra, was sufficiently like this one in its facts and results to make it a positive precedent for plaintiff, and in it the court examined and considered the effect of many decisions. If the trust company's officers, without knowledge of the source from which the money came, or of facts sufficient to put a person of ordinary prudence on inquiry, placed fifteen hundred dollars, or thereabouts, of the proceeds of the mortgaged cattle subject to Wilkins' check, and he checked same out, it was guilty of no breach of the duty it owed to Lakenan to use good faith and care to protect his equity of subrogation; otherwise it was in fault and Lakenan must stand discharged from a proportionate liability on the note. We are pressed to defer to the opinion of the court below on the issue of the knowledge of those officers, as the evidence is contradictory; but though there is a conflict as to what passed between Wilkins and the two officers of the

trust company when the former returned from Chicago, the facts apart from this conversation are not in dispute. If Wilkins' testimony is accepted, Mundy was told the money the company had received by Wilkins' order had been raised by selling the mortgaged cattle. It was natural for Wilkins to tell him how the money was obtained, especially as Wilkins asked, he says, to use all of it toward paying the mortgage debt, and Mundy says he asked to use part of it for that purpose. But Mundy denied Wilkins mentioned what cattle had been sold, and denied further inquiring about the matter. Granting this is true, we think Mundy was in possession of facts which should have led him to ask if the money represented the mortgaged cattle, before allowing Wilkins to dispose of it at his pleasure. Though Mundy said it was customary for stock men who were patrons of the company, to deposit the proceeds of sales of stock to the company's credit in some bank where they marketed cattle, and customary for the company on receiving advice of the fact, to place the amount to the credit of the patron, there is nothing to prove such a transaction had occurred before in dealings between the company and Wilkins. The dealings between those parties, as Wilkins' account on the books of the bank shows, dated from December 12, 1903, when the original loan of three thousand dollars was made to him, and the items of the account relate to the disposition of that loan and the loan of seven hundred dollars, both of which were merged in the note in suit. The items consisted of checks drawn by Wilkins against the funds thus procured, and against the proceeds of the mortgaged cattle. If there were any other transactions, they were of a trivial nature. Mundy said he knew the money deposited to the company's credit in the Chicago bank was the proceeds of stock Wilkins had shipped to Chicago and sold. He had been informed by the National Live Stock Bank the money for cattle sold by Wilkins had been deposited to the credit of the trust

company, and subject to its order; an unusual and noticeable act, as Wilkins was no general customer of the trust company and in the habit of making large deposits in it, or, indeed, any deposits except when he borrowed money from it. Besides, he made no request for the money to be placed to his credit, but had it deposited to the company's credit and subject to its order. Mundy did not deny or admit the Bowles Commission Company had written regarding what had been done with the proceeds of the sale of Wilkins' cattle, and it is to be inferred from the testimony of the secretary of the commission company and from the name of the trust company appearing on the account of sales shown supra, that said account had been rendered to the trust company. The account showed on its face the sale was of the exact number of cattle covered by the trust company's mortgage, less one which had died; and, moreover, there was no reason for rendering the statement, except the trust company's lien on the cattle. The officers of said company were put in possession of these facts on August 17th, and were aware of them on August 18th, when Wilkins visited the company and asked Mundy if any credit had been received for cattle sold by him. With such knowledge in the minds of the officers, it is perfectly clear to us they were apprised of facts which would have led a man of common prudence to inquire whether the money represented the price of the mortgaged cattle, and clear also that a single question to Wilkins would have elicited the truth, and, if the company used the proceeds properly, would have resulted in protecting Lakenan. Such being the circumstances, the point for decision is whether the officers, in order to perform their obligation to exercise ordinary diligence to preserve the mortgage lien for indemnity to Lakenan, were bound to inquire regarding the source of the money Wilkins had put in their hands, accompanied with information that it was the proceeds of a sale of stock, before they turned part of it over to

him; for if this was their duty, the trust company is chargeable with notice of the facts, and cannot compel Lakenan to pay so much of the note as would have been satisfied by applying the whole sum as a payment on it. [Stern, etc., Co. v. Mason, 16 Mo. App. 473.] The rule that a person shall be treated as though he acted with knowledge of a material fact, if he was apprised of such minor facts as would have induced a prudent man to inquire about the main fact and inquiry would have ascertained the truth, was developed in chancery courts, but is now adopted in many actions at law. So was the rule which discharges a surety from liability when the creditor releases liens on the property of the principal debtor, though it, too, now pervades the rules of law governing the rights of creditors and sureties. [Mackintosh v. Wyatt, 3 Hare. 567; 27 Ency. Law (2 Ed.), 489.] It follows that when a creditor who has released a lien on property of the principal, seeks nevertheless to hold the surety responsible on the ground the creditor released in ignorance of the surety's right to look to the lien for indemnity, the above mentioned rule of the law of notice ought to be applied, though we have found no case where the question of its application under those circumstances was determined. This rule has been applied under diverse circumstances in order to enforce equitable titles or rights; perhaps most frequently where a person had acquired the legal title to property or a lien on it, with knowledge of facts which ought to have caused inquiry as to the existence of an unrecorded equitable right or title. [Rhodes v. Outcalt, 48 Mo. 367; Drey v. Doyle, 99 Mo. 459, 12 S. W. 287.] It is applied, too, where one buys or takes a lien upon the property of an insolvent debtor, whose intention is to hinder and defraud his creditors, and facts are known to the later purchaser or incumbrancer which, if followed by an investigation, would have exposed the purpose of the debtor. [Rupe v. Alcair, 77 Mo. 641; Roan v. Winn,

93 Mo. 503; 4 S. W. 736.]    Upon the same principle
a bank has been charged with notice that funds depos-
ited to the credit of an individual really belonged to
some one else, when the circumstances suggested the
truth and it would have been discovered by due dili-
gence.    [Eyerman v. Bank, 13 Mo. App. 289, 84 Mo.
408.]    A lender had taken a mortgage on some mining
property, and during the negotiation for the mortgage,
had learned the borrower did not as yet own the prop-
erty  but expected to buy it from a mining company,
paying part of the purchase money and executing a
mortgage on the property for the remainder.    As the
lender took his mortgage knowing of the pending sale
from the mining company, it was held he ought to have
inquired about the terms of the sale, and was affected
with knowledge of them and, among others, of the
agreement to give the mining company a mortgage for
part of the purchase money.    Hence said mortgage was
awarded priority to the plaintiff's, though, in point of
fact, it was not recorded until later.    [Montgomery v.
Keppel, 75 Calif. 128, 78 Am. St. Rep. 125.]    The right
of the mining company to priority was adjudged be-
cause the lender might have ascertained the existence
of the equity by pursuing the facts he knew.    In the
cited case the ultimate fact of which notice was to be
imputed was the existence of an outstanding equity in
certain property; here the ultimate fact was not the
existence of an equity in favor of Lakenan, but whether
that equity related to a particular property, to-wit, the
money Wilkins had put in the trust company's hands.
Said company knew, or must be presumed to have
known, Lakenan had the right to have the proceeds
of the mortgaged cattle, if said proceeds passed into
the company's hands, applied on the mortgage debt.
Hence there is no occasion for the application of the
doctrine of notice to that right; but the question is
rather whether the trust company was bound, consider-
ing the facts it knew, to ask if the money Wilkins had

put to its credit as the price of a shipment of stock, had accrued from a sale of the stock to which Lakenan might have recourse if he was compelled to pay Wilkins' note. There seems to be no sound reason why the trust company's officers were not as much bound to take this precaution, as they would have been to inquire concerning the real owner of money deposited with it, if the circumstances suggested the depositor was not the true owner. We do not say removing the cattle to Illinois and selling them without the mortgagee's consent, defeated the latter's lien or that the purchaser could hold the cattle against it. [2 Cobby, Chat. Mort., sec. 588; Jones, Chat. Mort. (5 Ed.), sec. 260a.] What we decide is that if the trust company either ratified the sale by knowingly accepting the proceeds and turning part of them over to Wilkins, or turned part over to the latter when by due care it could have learned the facts, it committed a breach of duty which materially altered the situation as to Lakenan and rendered it so difficult or impossible for him to enforce his right of subrogation, that he ought to stand discharged *pro tanto*. The rule is stated broadly enough in one treatise to embrace the case at bar:

"Where such facts or circumstances are known to a person in relation to a matter in which he is interested as are sufficient to make it his duty as an honest and prudent man to inquire concerning the rights of other persons in the same matter, and the course of inquiry thus suggested would, if followed with due diligence, lead to a discovery of rights in conflict with his own, the general rule is that he will be held chargeable with notice of all that he might thus have discovered, and will not be heard to say that he did not actually know of the fact or claim in question." [21 Ency. Law (2 Ed.), 584.]

We do not see how Lakenan's knowledge that the cattle had been shipped, or the payment to him by Wilkins of debts the latter owed out of money the com-

pany had already put to Wilkins' credit, can affect the former's right to hold the company responsible for not devoting the money toward payment of the note.

The judgment is reversed and the cause remanded with a direction to treat the note as credited in favor of Lakenan, the security, on August 18, 1904, with the sum of $3421.02, and enter judgment against him for the balance due, after taking account of other payments; the costs to be taxed against defendants. All concur.