Jesse E. HERRMAN and Carrie M. Herrman, partners, doing business as Herrman Lumber Company, Plaintiffs-Appellants,

v.

R. V. DAFFIN and Isabelle D. Daffin, husband and wife, Defendants-Respondents,

and

Vernon G. (Jack) Altman and Vernon Gibson, doing business as Altman and Gibson, and Karl W. Blanchard, Trustee, and First State Bank of Joplin, Missouri, a corporation, and Joplin Cement Company, a corporation, Defendants.

No. 7543.

Springfield Court of Appeals.

Missouri.

May 9, 1957.

Ray E. Watson, Watson & Tudor, Joplin, for plaintiffs-appellants.

Karl W. Blanchard, Herbert Van Fleet, Seiler, Blanchard & Van Fleet, Joplin, for defendants-respondents.

RUARK, Judge.

This case arises out of the fact that an owner (Daffin) paid his contractors (Altman and Gibson Construction Company) the balance on construction price of a residence. The contractors in turn paid a portion of the money to their materialmen (Herrman Lumber Company, a partnership), who applied such payment to other, and older, indebtedness due them from the contractors, thus leaving exposed and unpaid their debt for the materials which went into the Daffin house. Later the materialmen filed suit to foreclose a mechanic's lien on this house.

At a pretrial conference a special jury issue was made up as to whether the payment made by the contractors should have been applied to the debt owed for materials which went into Daffins' house. The jury found the issues in favor of Daffins, and plaintiffs-materialmen have appealed. The first question raised by appellants is "that defendants did not produce sufficient evidence to justify the court in submitting that question to the jury," and that plaintiffs' motions aimed at such question should have been sustained.

■ The general rule in regard to application of payments is that the debtor has the right to specify the account to which the payment will be applied. If the debtor fails to so specify, the creditor may make the application; and if neither debtor nor creditor exercises his prerogative, then the law will make the application as right and justice requires, usually to the credit of the oldest unsecured account.[1] This general rule is applicable to payments made by a contractor to a materialman, but it is subject to the qualification that if the materialman creditor knows or is chargeable with knowledge of the source of such payment, then (the majority rule is) it becomes the

1. 70 C.J.S. Payment § 50, p. 255; 40 Am. Jur., Payment, § 129, p. 803, § 132, p. 806; Short v. White, 234 Mo.App. 499, 133 S.W.2d 1039, and cases cited at loc. cit. 1043; Severs v. Williamson, Mo.App., 209 S.W.2d 572, and cases cited at loc. cit. 577.

duty of the materialman to make the application in such manner and to such items as will give credit to and protect the rights of the person so supplying the funds.[2, 3]

■ We do not find where the Missouri courts have spoken on this question. In Campbell Glass & Paint Co. v. Davis-Page Planing Mill Co., 130 Mo.App. 474, 110 S. W. 24, 25, the statement was made that the creditor was not "bound to ascertain from what particular contract the contractor realized the money with which he made payments." That case, however, did not involve knowledge or notice and therefore is not decisive. But the mechanics' lien statutes have an equitable purpose, their aim being to accomplish substantial justice between the parties,[4] and if we are to borrow coals from our neighbor states we choose the majority rule, which applies equitable principles.[5]

■ The inquiry, then, is whether the jury could have reasonably found or inferred from the facts and circumstances that plaintiffs' manager had knowledge of the source of the funds with which the contractors paid him. Whether there was evidence to carry to the jury the question of plaintiffs' knowledge requires a review of (only) the evidence most favorable to establish the affirmative of such question (knowledge), since the verdict was in favor of the defendants-proponents of that question.[6]

■ Knowledge may be proved by circumstantial evidence as well as by direct evidence.[7] But the circumstances must be such that the necessary fact may be inferred therefrom and must reasonably follow, so that the conclusion so reached is not the result of guesswork, conjecture or speculation,[8] and such evidence must "have a tendency" to exclude every other reasonable conclusion.[9]

Another facet of the inquiry is whether or not the jury might reasonably have found that plaintiffs were in possession of such information as would charge them with knowledge of the source of the funds.

2. 57 C.J.S. Mechanics' Liens § 249, p. 826; 70 C.J.S. Payment § 64, p. 268; 36 Am. Jur., Mechanics' Liens, § 227, p. 145; 40 Am.Jur., Payment, § 123, p. 800; 130 A.L.R. 201 (supplementing 49 A.L.R. 955 and 21 A.L.R. 714); Modesto Lumber Co. v. Wylde, 217 Cal. 421, 19 P.2d 238; Long-Bell Lumber Co. v. Auxer, 221 Ark. 672, 255 S.W.2d 163; Carolina Portland Cement Co. v. United States Fidelity & Guaranty Co., 18 La.App. 105, 137 So. 381, 383; Trauth v. Voss, 231 Ky. 544, 21 S.W.2d 832; Farnsworth & Co. v. Electrical Supply Co., 5 Cir., 112 F.2d 150, 130 A.L.R. 192, Id., 5 Cir., 113 F. 2d 111, 130 A.L.R. 197; see Bain-Nicodemus, Inc., v. Bethay, Tenn.App., 292 S.W. 2d 234, 241; see Bay Lumber Co. v. Pickering, 120 Cal.App. 163, 7 P.2d 371, 372, 373, as to conflicting theories; see also Georgia State Sav. Ass'n v. Sun Lumber Co., 138 Okl. 11, 280 P. 281.

3. J. F. Kane & Co. v. F. R. Woodbury Lumber Co., 121 Wash. 149, 208 P. 1107; Townsend v. Caple, 193 Ark. 297, 99 S.W. 2d 258; Webb Const. Co. v. Crane Co., 52 Ariz. 299, 80 P.2d 698, 707; U.S. for use of Carroll v. Beck, 6 Cir., 151 F.2d 964, 166 A.L.R. 637.

4. 57 C.J.S. Mechanics' Liens § 1a, p. 492; Johnson v. Brill, Mo.Sup., 295 S.W. 558, 562; see Henry & Coatsworth Co. v. Evans, 97 Mo. 47, 10 S.W. 868, 3 L.R.A. 332.

5. See Lakenan v. North Missouri Trust Co., 147 Mo.App. 48, 126 S.W. 547, 551.

6. See cases collected, West's Missouri Digest, vol. 3, Appeal and Error, ☞927(7), 930(1); see cases collected, Raymond Missouri Instructions, vol. 1, § 15, p. 24 et seq.

7. Butler v. City of University City, Mo. App., 167 S.W.2d 442, 445; State on inf. of McKittrick v. Graves, 346 Mo. 990, 144 S.W.2d 91, 94.

8. 32 C.J.S. Evidence § 1039, p. 1099; Heinold v. Muntz TV, Inc., Mo.Sup., 262 S.W.2d 32, 36, and cases cited; Vinson v. East Texas Motor Freight Lines, Mo. Sup., 280 S.W.2d 124, 129.

9. Duggan v. Rippee, Mo.App., 278 S.W.2d 812.

One way of saying it is that the knowledge of the ultimate fact (in this instance that the source of the money was Daffin) will be imputed to the plaintiffs if they were in possession of such information (sum total knowledge of minor facts) as would have impelled an honest, reasonable and prudent man to inquire about the main fact, if the means of making such inquiry were reasonably available to them and if, had such inquiry been made, it would have produced and made apparent the ultimate fact.[10] In James v. Hutchinson, Mo.App., 211 S.W.2d 507, 510, it is said:

"[N]otice does not usually require proof of positive information brought directly home to the party sought to be charged therewith, but instead, if the means of knowledge are placed in his hands under such circumstances as to have put an ordinarily prudent person on inquiry, he is then to be charged with knowledge of whatever facts a proper inquiry would have disclosed. Meier v. Blume, 80 Mo. 179. 'Whether one actually knows a given fact is often a secret to which he alone has the key, but justice is not so indulgent as to encourage his throwing the key away.' Barrett v. Davis, 104 Mo. 549, 561, 16 S.W. 377, 380."

The record is voluminous and we do not attempt to set forth any of it except that which we believe is favorable to defendants-owners Daffin, who received the verdict. The partnership of Altman and Gibson Construction Company, which was the contractor in this instance, entered into the house building business about January 1, 1953. It was dissolved about Labor Day, 1954. From the beginning this company had money troubles, with plaintiffs, whom we call "materialmen," as well as other creditors. From time to time all its creditors were "trying to find out when they were going to get some money," and, according to one of the contractors, the fellow who kept after them the most was "the fellow that got the money." Plaintiffs-materialmen had supplied the contracting firm from the outset and such contracting firm bought practically all of its lumber requirements from plaintiffs. Plaintiffs-materialmen's bookkeeping process was that daily purchases and credits made by the contractors were entered on individual tickets and posted upon ledger sheets the following day. The materialmen kept individual ledger sheets for each separate "job" of these contractors, and such ledger sheets were kept posted to date. Thus the credit status of each of the contractors' separate projects was discernible at a glance. Owner Daffin's contract called for a fixed price, but from time to time changes were made which added to that price. The materialmen carried one ledger sheet which showed the principal charges and a separate ledger sheet showed these "extras." According to the ledger sheets, the contractors' purchases of materials for the owners-Daffins' residence commenced on April 13, 1954, and continued with purchases almost every day until the last purchase dated July 12, 1954. The purchases made during the last twenty days were comparatively small. The balance carried forward on this date showed an indebtedness, on the "regular" sheet, of $4,652.03, and $390.14 on the "extra" sheet. The materialmen likewise kept "close tab" on the progress of these contractors and the completion date on the various jobs upon which the contractors were engaged. Occasionally Cummins, who was materialmen's general manager, would call upon the contractors on the job and ask about prospects of payment. The contrac-

10. 66 C.J.S. Notice § 3, p. 637, § 11, p. 642; Merrill on Notice, vol. 1, § 66, p. 68 et seq.; Wade on the Law of Notice, 2d ed., § 11, p. 9; Lakenan v. North Missouri Trust Co., 147 Mo.App. 48, 126 S.W. 547, 551; Golden v. National Utilities Co., 356 Mo. 84, 201 S.W.2d 292, 297; Cole v. F. Mayer Boot & Shoe Co., 221 Mo.App. 1250, 300 S.W. 321, 322; Loduca v. St. Paul Fire & Marine Ins. Co., Mo.App., 105 S.W.2d 1011, 1013; see Richmond v. Ashcraft, 137 Mo.App. 191, 117 S.W. 689, 692–693; see cases cited under footnote 3.

tors had frequent discussions with Cummins in regard to the account they owed materialmen "from the time we started business on through."

"Q. Did he say anything to you, ever in conversation say anything to you about the completion date on your jobs? A. Yes.

"Q. What was the conversation? A. We owed him money. He was naturally interested in getting it.

"Q. Did he tell you that in so many words? A. Yes, sir."

In addition to these calls by the general manager, his representative, somebody, generally "made" some of the contractors', jobs every day.

Sometime in June, about a month prior to the completion of the Daffin residence, Cummins, the materialmen's general manager, called upon the contractors at their office. According to the contractor Gibson, "I believe Mr. Altman invited him out. I am not positive of that, but I believe he did, and we told him we would have some money before long. Just as soon as we completed that job."

"Q. What do you mean by 'that job'? A. Well, Mr. Daffin, and some other jobs we were still working on.

\* \* \* \* \* \*

"Q. Now at that time and at any time previous to that, had Mr. Cummins said anything to you about how you were to apply the money you received from these various jobs and paid to him? A. Well, I remember one time that he said we would have to pay these older accounts up to keep him out of trouble with his company. We had owed him ever since we started on 10th Street, because they didn't sell."

In this June conversation:

"Q. Did you tell Mr. Cummins when those jobs were to be completed you would have money to pay him? A. Yes."

In July, some four or five days before final completion of the Daffin residence, this contractor had another conversation with Cummins. "When I went in the office that day, he asked me when we would have some money for him, and about when we was going to finish the Daffin job. I said we should complete it in four or five days as near as I could tell and we would have some money for him." And again:

"Q. Was anything said about making any payment when you received the Daffin money? A. He said, 'I sure hope so,' shook his head like that, 'I sure need some money from you.'"

The witness stated he did not inform Cummins how *much* money would be coming from the Daffin job. It does appear that the contractors had two (and perhaps other) jobs in progress, but there was no other job near completion from which the contractors could expect any substantial amount of money within the next few days; and the contractors had no other job project on which they owed the plaintiffs-materialmen an amount that approximated $5,000. Cummins testified that he would from time to time attempt to keep check on and collect money from the contractors. He said he had several conversations with the contractors about back accounts but that he had no recollection of discussing with them when the Daffin job would be completed and that he at no time made any effort to collect on the Daffin job. He acknowledged, however, that in his deposition taken previously he had testified that "so far as we were concerned" the Daffin job was completed on July 14, 1954, although he said he didn't know where he got that date. Again in his testimony at trial he was asked:

"Q. Then this next question was asked you: 'And that is when you expected your money, is that right?' An-

swer: 'Well, it was 7–14.' Is that correct? A. If it is there, it is yes.

"Q. That was when you expected your money? A. That is right."

The Daffin residence was completed "around" July 15, and on July 21 the owner Daffin gave the contractors his personal check for final payment in the amount of $10,557. The check carried no notation which restricted payment to other than the contractors. Daffin apparently gave the contractors no directions, except a request to give him an affidavit as soon as they (the contractors) got the bills paid. The contractors in turn deposited this check in their own bank account, which, before such deposit, contained approximately $700. On July 27, 1954, Gibson, one of the contractors, took to the plaintiffs-materialmen a check for $6,000. This check was drawn on the contractors' account and was payable to the plaintiffs-materialmen. It contained no restriction or requirement in regard to application of payment. The contractor testified that he couldn't truthfully say "either way" whether he did or did not tell Cummins, the manager for materialmen, whether he had collected from Daffin (the source of the money) or not. Cummins testified at the trial that he was not told that the Daffin account had been paid to the contractors; that he did not know "to this day" whether Daffin had paid the contractors. The bookkeeper for the materialmen, one Gene Broadwater, was present at this transaction but was not called as a witness.

On this occasion Cummins asked the contractor "if he wanted to apply that [$6,000.00 payment] to these various old accounts, these nine jobs already been introduced, and he said he supposed so." These nine accounts, carried and shown on separate ledger sheets, were accounts which the contractors owed the materialmen, all of which had been inactive for several months, and in most of which the lien time had expired. The largest was for

$2,066.21, the smallest was for $49.96. The exhibits indicate that seven of these were credited with full payment as of July 27, 1954. The remaining two appear to have been credited as of July 29, 1954. The total of these applications out of the $6,000 check left a "left-over" sum of $131.09, which amount was credited to the account which the contractors owed in reference to the Daffin residence.

Sometime in September, according to owner Daffin, he called Cummins over the phone and asked him about the contractors' Daffin residence account. "I told him Mr. Gibson had told me he had paid my account with the $6,000.00 check. He said, 'Yes, we know that was your money, but,' he said, 'you weren't smart enough to put our name on the check, so we credited it to older accounts.'" Cummins in turn acknowledged receiving a telephone call from Daffin but denied the conversation above stated.

■ It is our conclusion from a review of this evidence that the jury could have reasonably inferred that the plaintiffs' manager, by reason of his familiarity with the whole situation, had knowledge that the source of the payment was Daffin; or, stated in another way, the facts and circumstances were such that they reasonably could have determined that he was in possession of such information which would and should have called upon the reasonably prudent person, situate in his position, to have made some inquiry. The means by which he could have ascertained the crucial and important fact were so readily and easily available that his failure to make such inquiry (either from the man making the payment, or by calling Daffin) could have justified the jury in assuming, under the circumstances existing in this case, that, if he did not actually know, he abstained from inquiry in order that he would *not* know. We are of the opinion that the court was not in error in submitting the question to the jury and in refusing plaintiffs' motions for a verdict and judgment.

We attempt to summarize the instructions as follows:

*P–1.* The issue is whether plaintiffs credited the proceeds of the $6,000 check properly or whether it should have been credited to the Daffin job.

*P–2.* If the contractors had several jobs going at the same time and they made the $6,000 payment by their own check, then plaintiffs were "not bound to ascertain" from what particular source the contractors got the money, and if plaintiffs applied the money (as it was applied) with the consent of the contractors, then the verdict must be for plaintiffs, *unless you find plaintiffs had knowledge of the source of said fund as defined and set forth in other instructions.*

*P–3.* The burden is on Daffin to prove that plaintiffs knew "or had sufficient knowledge to have reason to then know" that Daffin was the source of the money paid by the contractors, and if plaintiffs "did not then have sufficient knowledge to then know" that Daffin was the sole and only source, or if the jury are unable to determine from the evidence whether or not plaintiffs knew *"or had sufficient knowledge to have reason to then know"* that Daffin was the source of the money, then the verdict must be for plaintiffs.

*D–4.* On the issue of whether plaintiffs knew, or had sufficient information to be put on inquiry, the knowledge of the agent Cummins would be knowledge of the plaintiffs.

*D–5.* If plaintiffs had knowledge of sufficient facts and circumstances in connection with the payment as to give them actual knowledge of the source of the funds "or put them on inquiry as to the source of said funds," and such inquiry, if followed with due diligence, would have revealed the source of the funds, then it was plaintiffs' duty to apply them to the Daffin account, and if at the time payment was made plaintiffs (through Cummins) had *'sufficient knowledge of facts and circum-*

*stances, as shown by the evidence,"* of the operations of the contractors as to put plaintiffs on inquiry as to the source of the funds, which inquiry, if diligently pursued, would have revealed the source, then the verdict must be for defendants.

*D–6.* If plaintiffs had actual knowledge that the $6,000 came from Daffin, then it was the duty of plaintiffs to apply so much of the payment as was necessary to the Daffin account, and if plaintiffs had such actual knowledge the verdict should be in favor of Daffin "on the issue of whether said plaintiffs knew or had sufficient facts to put them on inquiry as to the source of said $6,000.00 payment."

The form of verdict on submission of this special issue was:

"We, the jury, find that plaintiffs should have credited the proceeds of the $6,000 check mentioned in evidence first to the payment in full of the Daffin account in the amount of $5,139.93, and not just the balance of $131.09."

The first complaint as to instructions is against the court for adding to P–2 the italicized portion. In view of what we have already said, this addition was not error. Had it not been made the instruction would have amounted in effect to a directed verdict.

A more serious complaint is that instruction D–5 does not hypothesize or point out what facts and circumstances were sufficient to put the plaintiffs on inquiry and does not give the jury any guide in determining whether plaintiffs had knowledge or are chargeable with knowledge.

■ As to the failure to hypothesize, it would have been practically impossible to have set forth all the "facts and circumstances as shown by the evidence," which arose over an extended period of time and covered a large number of transactions, most of them undisputed, but some of which were disputed in the sense that the plaintiffs' manager stated that he did not recall

them, and some of which were undisputed as to the principal occurrence but were in dispute when it came to variations in language and, in some instances, interpretation of the meaning of certain expressions. Certainly such hypothesization could not have been made without grave danger of comment or omission.[11] The *ultimate fact* was knowledge or possession of such knowledge as would require inquiry. An instruction should ordinarily hypothesize the effect of the evidence tending to show a state of facts, rather than recite the evidence as it was given,[12] especially when there is only one particular issue to be found.[13]

■ The jury were informed by plaintiffs' instruction 3 that it was necessary that plaintiffs "knew or had sufficient knowledge to have reason to then know" that the source of the money was Daffin; and were required to find that plaintiffs had sufficient knowledge of facts and circumstances, as shown by the evidence, of the operations of Altman and Gibson as to put plaintiffs on inquiry as to the source of said fund (defendants' instruction 5). All instructions must be read as an entirety and as one complete combination in the light of the evidence, and if they contain a complete exposition of the law on the subject at hand which is understandable by the average man who composes the jury, then that is sufficient to preclude a reversal, even though one or more of the instructions, taken alone, may contain defects which would make it erroneous.[14]

As to whether the expression "put on inquiry" was too broad, unquestionably the jury should have been governed by considerations of what would have put an honest man of ordinary prudence on inquiry.[15] But the plaintiffs in their own instruction which informed the jury that the criterion was whether plaintiffs had sufficient knowledge "to have reason to then know" did not give any definition of what character of "reason" was to be applied. They themselves fixed and set the pattern which defendants followed in omitting such characterization from their exposition as to the ultimate fact. Hence plaintiffs now are hardly in position to complain.[16]

■ Assuming that the instruction *should* have contained the hypothesis that the information was that which would have put (a reasonably prudent man) on inquiry, the sin was one of omission, or rather incomplete exposition, rather than misdirection, and if plaintiffs feared the effect of such incompleteness they should have offered an instruction to fill out and clarify that which they felt was incomplete.[17]

11. To illustrate, see Mears v. Gage, 107 Mo.App. 140, 80 S.W. 712.

12. Brinkmann Realty Co. v. Deidesheimer, Mo.App., 201 S.W.2d 503.

13. Ashenford v. L. Yukon & Sons Produce Co., 237 Mo.App. 1241, 172 S.W.2d 881, 891.

14. De Winter v. Lashley, Mo.App., 274 S.W.2d 40; Bidleman v. Morrison Motor Freight, Mo.App., 273 S.W.2d 745; Patterson v. Thompson, Mo.App., 277 S.W.2d 314; State ex rel. Burcham v. Drainage District No. 25, Mo.App., 280 S.W.2d 683; Hadley v. Smith, Mo.App., 268 S.W. 2d 444.

15. John Deere Plow Co. v. Sullivan, 158 Mo. 440, 59 S.W. 1005; Stottlemyre v. Swearingen, Mo.App., 297 S.W. 1003; see Lakenan v. North Missouri Trust Co., 147 Mo.App. 48, 126 S.W. 547, 551.

16. Link v. Jackson, 158 Mo.App. 63, 139 S.W. 588, 597, Id., 164 Mo.App. 195, 147 S.W. 1114; Palmer v. Lasswell, Mo.Sup., 287 S.W.2d 822, 828; State at the Relation and to use of P. W. Finger Roofing Co. v. Koch, Mo.App., 272 S.W. 2d 22, 26; Palmer v. Kansas City, Mo. App., 248 S.W.2d 667, 669; Anderson v. Woodward Implement Co., Mo.Sup., 256 S.W.2d 819; see Raymond Missouri Instructions, vol. 1, § 207, p. 180.

17. Baker v. Aetna Casualty & Surety Co., Mo.App., 193 S.W.2d 363; Evinger v. Thompson, 364 Mo. 658, 265 S.W.2d 726, 733; Chavaries v. National Life & Accident Ins. Co. of Tenn., Mo.App., 110 S.W.

■ █ Our conclusion is that, taking the instruction as a whole and in the light of the evidence, the jury were given a sufficient understanding of the question which they were to determine so that they would not wander into speculation or make their finding upon a false premise, and that in any event the plaintiffs are not now in position to complain.

Complaint is made of D–6. It is repetitious and contains unnecessary words which make it awkward, but we are cited to no authority for declaring that it involves prejudicial error, and we find none.

Plaintiffs-appellants also assign error in admitting testimony that the payment made by Daffin to the contractors, the source of the $6,000 paid by the contractors to the plaintiffs, was $10,557, which was the final "in full" payment of the balance of the contract price, including extras.

█ To be sure, the bare fact that the owner has paid his contractor is not, *of itself,* a defense against a materialman's lien,[18] and the admission of such evidence where the fact of such payment is no defense and is not relevant to the issue involved would be prejudicially erroneous.[19]

█ But in this case the fact the payment had been made was an essential element of defendants' claim that it was the source of the money which plaintiffs received; and the amount so paid and the fact that it was the final contract payment, "including extras," was so interwoven with the fabric of facts and circumstances which respondents contended, and still contend, established knowledge on the part of plaintiffs as to be inseparably pertinent. The trial court usually has considerable discretion, and a wide latitude is allowed, in the admission of circumstantial evidence, especially when direct evidence is lacking.[20] We are of the opinion that the admission of such evidence was not error under the circumstances of this case.

Our determination of these questions favorably to the respondents makes unnecessary any consideration of contentions made by the respondents on their cross-appeal. Those questions have now become moot.

The judgment is affirmed.

McDOWELL, P. J., and STONE, J., concur.

2d 790, 794; Haycraft v. Haycraft, Mo. App., 154 S.W.2d 617.

18. Ittner v. Hughes, 133 Mo. 679, 34 S.W. 1110.

19. Better Roofing Materials Co. v. Sztukouski, Mo.App., 183 S.W.2d 400.

20. 31 C.J.S. Evidence § 161, p. 871; Smith v. St. Louis Public Service Co., Mo.App., 84 S.W.2d 161; Mosby v. McKee, Zook & Whiteford Commission Co., 91 Mo.App. 500.