

# In the Missouri Court of Appeals
## Eastern District
### DIVISION THREE

JOHN DOE 122,

    Appellant,

vs.

MARIANIST PROVINCE OF THE UNITED
STATES AND CHAMINADE COLLEGE
PREPARATORY, INC.,

    Respondents,

and

FR. MARTIN SOLMA,

    Defendant.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

No. ED107767

Appeal from the Circuit Court
of St. Louis County
15SL-CC03799

Honorable Kristine Allen Kerr

FILED: December 31, 2019

### OPINION

John Doe 122 ("Appellant") appeals from the trial court's "Order and Judgment"

("Judgment") granting summary judgment in favor of Marianist Province of the United States

(the "Marianists"), Chaminade College Preparatory, Inc. ("Chaminade") (the Marianists and

Chaminade are hereinafter collectively referred to as "Respondents"), and Fr. Martin Solma ("Fr.

Solma")[1] on Appellant's claims of sexual abuse or battery, negligent supervision, intentional

failure to supervise clergy, negligent failure to supervise children, intentional infliction of

---

[1] Although named in Appellant's petition, Fr. Solma was ultimately dismissed as a defendant on October 1, 2018 and is not a party to this appeal.

emotional distress, and breach of fiduciary duty.[2] We would affirm the Judgment of the trial court, but due to the general interest and importance of the issues on appeal, we transfer the case to the Supreme Court of Missouri pursuant to Rule 83.02.

Factual and Procedural Background

Appellant was born on May 7, 1953 and attended Chaminade as a high school senior in 1971. At that time, Brother John Woulfe ("Bro. Woulfe"), a Marianist brother, was employed by Chaminade as a guidance counselor and assigned to provide college counseling to Appellant.[3] Appellant met with Bro. Woulfe in his office approximately eight to ten times throughout his senior year. Over the course of the appointments, however, Appellant was subjected to several escalating instances of sexual abuse ranging from Bro. Woulfe's encouraging Appellant to look through Playboy magazines in the first session and masturbating while Bro. Woulfe watched in the second, to Bro. Woulfe masturbating in front of Appellant and ultimately touching Appellant's penis and putting his mouth on Appellant's penis in the last encounter.

While Appellant knew the abuse "wasn't right," he felt shame and guilt and did not tell anyone about it. When Appellant graduated from Chaminade in the Spring of 1971, the abuse "was fresh in [his] mind," and he would "think about it from time to time" because it was "st[u]ck in [his] mind for a while." Appellant remembered the abuse through the summer of 1972, but he soon attempted to "put everything behind [him]," throwing "anything to do with Chaminade" away and moving to Arizona. By 1973, Appellant, who "was really trying to look ahead," alleges he had no further memory of the abuse.

---

[2] Appellant challenges the trial court's grant of summary judgment only as to his claims of negligent supervision, intentional failure to supervise clergy, and negligent failure to supervise children.
[3] Bro. Woulfe died prior to Appellant's filing of this suit.

In early 2012, Appellant received a letter from Fr. Solma, Provincial of the Marianists, which indicated that the Marianists had received an allegation of sexual abuse against Bro. Woulfe. The letter "brought the memories back" to Appellant, and on November 4, 2015, Appellant filed a petition against Respondents, alleging sexual abuse or battery in Count I, negligent supervision in Count II, intentional failure to supervise clergy in Count III, negligent failure to supervise children in Count IV, intentional infliction of emotional distress in Count V, and breach of fiduciary duty in Count VI.

On March 14, 2018, following discovery, Respondents filed a Motion for Summary Judgment ("Motion"), their Statement of Uncontroverted Material Facts with supporting exhibits, and a Memorandum in Support of their Motion. As is relevant to this appeal, they first argued that summary judgment must be granted on all counts against them because both applicable statutes of limitations—Section 516.140 RSMo 2000[4] on the battery count and Section 516.120(4) on the remaining counts—had expired because Appellant provided no evidence to show that his memory was repressed so as to toll the limitations period. See Powel v. Chaminade College Preparatory, Inc., 197 S.W.3d 576 (Mo. banc 2006). Second, Respondents argued that Appellant's negligence claims were barred under Gibson v. Brewer, 952 S.W.2d 239 (Mo. banc 1997), because a determination of whether a religious entity acts "reasonably" constitutes an excessive entanglement in religious doctrine, policy, and administration in violation of the First Amendment. Third, they argued that summary judgment in their favor was appropriate on Appellant's intentional failure to supervise clergy claim because Appellant had admitted in his deposition "that he has no information that [Respondents] knew that [Bro.]

---

[4] Unless otherwise indicated, all further statutory references are to RSMo 2000 as amended.

3

Woulfe was allegedly abusing children" prior to Appellant's abuse, and he presented no other evidence to establish such knowledge.

On June 6, 2018, Appellant filed his Memorandum in Opposition to the Motion, Objections and Response to the Statement of Uncontroverted Material Facts, Statement of Additional Facts, and supporting exhibits. Among the exhibits filed were the Marianists' personnel records for Bro. Woulfe dating from approximately 1959 through 1977, which contained evaluations of Bro. Woulfe and letters to and from him. Additionally, Appellant filed the deposition, from a companion case against Respondents, of Fr. Quentin Hakenewerth ("Fr. Hakenewerth"), former Provincial of the St. Louis Province, wherein he testified that Bro. Woulfe was removed from Chaminade in 1977 after he learned of a student's complaint that Bro. Woulfe made sexual advances toward him. Appellant also filed the companion-case deposition and report of Fr. Thomas Doyle ("Fr. Doyle"), Appellant's expert witness. Fr. Doyle's report explained that, based upon language used in several documents in Bro. Woulfe's personnel file, he believed Respondents knew of Bro Woulfe's history of sexual abuse prior to Appellant's abuse. Appellant also filed three affidavits which were not notarized: his affidavit, stating that he had no memory of Bro. Woulfe's abuse from 1973 until 2012 when he received Fr. Solma's letter; and the affidavits of two additional former Chaminade students who both claimed that Bro. Woulfe had abused them. One of the students, C.M., claimed that he left Chaminade "before Christmas break in December 1971," but that "[s]hortly before [he] left Chaminade," he reported Bro. Woulfe's abuse to a faculty member.[5]

In his Memorandum in Opposition to Respondents' Motion, Appellant argued that summary judgment was improper because Respondents presented no undisputed material facts

---

[5] Because Appellant graduated in the Spring of 1971, C.M.'s disclosure of his abuse to faculty came after Appellant's abuse.

4

regarding whether they knew of Bro. Woulfe's history of abuse prior to Appellant's abuse, and that a genuine issue of material fact did exist as to Respondents' prior knowledge in light of Bro. Woulfe's personnel file and Fr. Doyle's opinion. Appellant further argued that summary judgment should not be granted as to his negligence claims because Gibson is contrary to United States Supreme Court precedent. Finally, Appellant claimed that the applicable statutes of limitations did not run because, contrary to Respondents' claim, he did present evidence that his memory of the abuse had been repressed until 2012 such that the limitations period did not accrue until that time.

On July 3, 2018, Respondents filed a motion to strike several of Appellant's exhibits, including Bro. Woulfe's personnel file and the unnotarized affidavits of Appellant and the two former Chaminade students. On October 10, 2018, Appellant filed a notarized copy of his affidavit, and on March 8, 2019, the trial court entered its Judgment. Therein, the trial court granted Respondents' motion to strike as to the former students' affidavits, denied it as to Bro. Woulfe's personnel file, and granted summary judgment on all counts in favor of Respondents. In granting summary judgment, the trial court determined, *inter alia*, that Appellant's negligence claims were barred by Gibson, that his intentional failure to supervise claim failed because there was "no *competent* evidence" of Respondents' knowledge of Bro. Woulfe's history of abuse, and that since all counts were disposed of on other grounds, consideration of the statute of limitations issue was unnecessary.

On March 26, 2019, Appellant filed a Motion to Vacate, Reopen and Amend Judgment and a Motion to Supplement the Record on Summary Judgment with notarized affidavits of the two former Chaminade students. On March 29, 2019, the trial court granted Appellant's Motion to Reopen the Judgment and his Motion to Supplement the Record, received the notarized

affidavits, and amended the Judgment to consider the new exhibits, but left intact its grant of summary judgment in favor of Respondent on all of Appellant's claims, finding the affidavits to have no bearing on its prior analysis. Additional facts relevant to Appellant's points on appeal will be included as needed below. Appellant's appeal follows.

Standard of Review

Appellate review of a trial court's grant of summary judgment is *de novo*. Penzel Construction Company, Inc. v. Jackson R-2 School District, 544 S.W.3d 214, 225 (Mo. App. E.D. 2017). Summary judgment is appropriate only "when the moving party has demonstrated, on the basis of facts as to which there is no genuine dispute, a right to judgment as a matter of law." Id. (quoting Binkley v. Am. Equity Mortgage, Inc., 447 S.W.3d 194, 196 (Mo. banc 2014)); Rule 74.04(c). We review the record in the light most favorable to the party against whom summary judgment was entered. Id.

A defendant establishes a prima facie case for summary judgment by showing any of the following:

> (1) facts that negate any one of the elements of a claimant's cause of action; (2) that the non-movant, after an adequate period of discovery, has not been able to produce, and will not be able to produce, evidence sufficient to allow the trier of fact to find the existence of any one of the claimant's elements; or (3) that there is no genuine dispute as to the existence of each of the facts necessary to support movant's properly pleaded affirmative defense.

Id. (quoting Storey v. RGIS Inventory Specialists, LLC, 466 S.W.3d 650, 654 (Mo. App. E.D. 2015)). Once the movant "has made a prima facie case showing that he is entitled to judgment as a matter of law under Rule 74.04(c), the [plaintiff's] only recourse is to show—by affidavit, depositions, answers to interrogatories, or admissions on file—that one or more of the material facts shown by the movant to be above any genuine dispute is, in fact, genuinely disputed." Id (quoting ITT Commercial Fin. Corp. v. Mid-Am. Marine Supply Corp., 854 S.W.2d 371, 381

6

(Mo. banc 1993)). A "genuine dispute" exists if the record contains "competent evidence of two plausible, but contradictory, accounts of essential facts," and in the summary judgment context, "there is a genuine dispute of a material fact only if the factual disputes might affect the outcome of the case." Id. (internal quotations omitted). "'Genuine' implies that the issue, or dispute, must be a real and substantial one, and not consisting merely of conjecture, theory and possibilities." Bryant v. Bryan Cave, LLP, 400 S.W.3d 325, 331 (Mo. App. E.D. 2013).

Applicability of <em>Gibson v. Brewer</em>

In Point I, Appellant argues that the trial court erred in granting summary judgment in favor of Respondents on his negligent supervision and negligent failure to supervise children claims because in doing so, the trial court relied upon Gibson v. Brewer, 952 S.W.2d 239 (Mo. banc 1997), which contravenes federal law and cannot control.

In Gibson, the plaintiff alleged that a member of a Diocese's clergy had sexually abused him, and he filed claims against the Diocese of, *inter alia*, negligent hiring/ordination/retention, negligent failure to supervise, negligent infliction of emotional distress, and independent negligence of the Diocese. Id. at 243-44. The trial court dismissed these counts against the Diocese on the basis that the claims as alleged infringed upon its rights under the First Amendment to the United States Constitution. Id. at 244. The Missouri Supreme Court affirmed, holding that the Free Exercise and Establishment Clauses of the First Amendment prohibit courts from entertaining claims against religious organizations where analyses of the relevant issues would require a determination on ecclesiastical matters such as "questions of religious doctrine, polity, and practice." Id. at 246-48. In so holding, the Court reasoned that:

> Religious organizations are not immune from civil liability for the acts of their clergy. If neutral principles of law can be applied without determining questions of religious doctrine, polity, and practice, then a court may impose liability. Id. at 246 (internal citations omitted).

7

Questions of hiring, ordaining, and retaining clergy, however, necessarily involve interpretation of religious doctrine, policy, and administration. Such excessive entanglement between church and state has the effect of inhibiting religion, in violation of the First Amendment. Id. at 246-47 (internal citations omitted).

By the same token, judicial inquiry into hiring, ordaining, and retaining clergy would result in an endorsement of religion, by approving one model for church hiring, ordination, and retention of clergy. A church's freedom to select clergy is protected as a part of the free exercise of religion against state interference. Ordination of a priest is a quintessentially religious matter, whose resolution the First Amendment commits exclusively to the highest ecclesiastical tribunals of this hierarchical church. Id. at 247 (internal quotes and citations omitted).

Adjudicating the reasonableness of a church's supervision of a cleric—what the church 'should know'—requires inquiry into religious doctrine…[T]his would create an excessive entanglement, inhibit religion, and result in the endorsement of one model of supervision. Id. at 247 (internal citations omitted).

On appeal, Appellant argues that Gibson should be disregarded because it misapplies the First Amendment and runs afoul of United States Supreme Court precedent. This argument has been considered and consistently rejected by the Missouri Court of Appeals. See, e.g., B.B. v. Methodist Church of Shelbina, Missouri, 541 S.W.3d 644, 654-56 (Mo. App. E.D. 2017); John Doe B.P. v. Catholic Diocese of Kansas City-St. Joseph, 432 S.W.3d 213, 219 (Mo. App. W.D. 2014); Doe v. Roman Catholic Archdiocese of St. Louis, 347 S.W.3d 588, 595-96 (Mo. App. E.D. 2011) (similarly finding Gibson to be controlling law in Missouri). "A claim that the Missouri Supreme Court has incorrectly decided a previous case or cases is not cognizable in the Missouri Court of Appeals." John Doe B.P., 432 S.W.3d at 219. "Missouri's Constitution expressly states that the Missouri Supreme Court 'shall be the highest court in the state' and that its 'decisions shall be controlling in all other courts.'" Doe v. Roman Catholic Diocese of St. Louis, 311 S.W.3d 818, 822 (Mo. App. E.D. 2010) (quoting Mo. Const. art. V, Section 2). Thus, we are "'constitutionally bound to follow the most recent controlling decision of the Missouri Supreme Court,' and inquiries questioning the correctness of such a decision are improper." Id.

8

(quoting Independence-Nat. Educ. Ass'n v. Independence Sch. Dist., 162 S.W.3d 18, 21 (Mo. App. W.D. 2015)). In turn, "a Missouri Supreme Court interpretation of federal constitutional law constitutes the controlling law within our state until either the Missouri Supreme Court or the United States Supreme Court declares otherwise." Id. (citing Chesapeake & O. Ry. Co. v. Martin, 283 U.S. 209, 221 (1931)).

"Gibson held that claims of negligent hiring, ordaining, retention, or supervision of clergy are not cognizable because such claims 'necessarily involve interpretation of religious doctrine, policy, and administration. Such excessive entanglement between church and state has the effect of inhibiting religion, in violation of the First Amendment.'" Doe v. Ratigan, 481 S.W.3d 36, 51-52 (Mo. App. W.D. 2015) (quoting Gibson, 952 S.W.2d at 246-47); see also Doe, 311 S.W.3d at 820, 824 (relying upon Gibson to uphold dismissal of negligence claims against a Diocese, including claim of negligent failure to supervise children). Appellant cites to no binding precedent that allows us to ignore the Missouri Supreme Court's holding in Gibson, which, in turn, constitutes controlling law in Missouri that we are bound to apply. Accordingly, because Appellant's negligent supervision and negligent failure to supervise children claims would require interpretation of religion doctrine, policy, and administration amounting to an excessive entanglement between church and state, the trial court did not err in granting summary judgment in favor of Respondents. Point I is denied.

<u>Respondents' Knowledge of Bro. Woulfe's Prior Sexual Abuse of Minors</u>

Because Appellant's Points II and III are related, we address them together. In Point II, Appellant argues that the trial court's grant of summary judgment on his intentional failure to supervise clergy claim was erroneous because Respondents "failed to support their motion with statements of 'material fact'" on the issue of their knowledge of Bro. Woulfe's history of sexual

9

abuse. In Point III, Appellant further argues that a genuine dispute exists as to Respondents' prior knowledge of such abuse in light of Bro. Woulfe's personnel file and Fr. Doyle's expert opinion. We disagree.

A cause of action for intentional failure to supervise clergy is established if (1) a supervisor exists; (2) the supervisor knew that harm was certain or substantially certain to result; (3) the supervisor disregarded this known risk; (4) the supervisor's inaction caused damage; and (5) the other requirements of the Restatement (Second) of Torts, section 317 are met.[6] Doe, 347 S.W.3d at 591; Gibson, 952 S.W.2d at 248. To satisfy the knowledge element, "the victim must present evidence of actual knowledge by someone at the same managerial level of the wrongdoer." Weaver v. African Methodist Episcopal Church, Inc., 54 S.W.3d 575, 585 (Mo. App. W.D. 2001).

During his deposition, Appellant testified that he "personally do[es] not" have any evidence or proof that, prior to his abuse, Respondents knew Bro. Woulfe engaged in sexual abuse of other minors, and that he "do[es]n't have any personal knowledge" that Bro. Woulfe's supervisors had ever been made aware of such abuse. Relying on this testimony, Respondents argued in their Motion that, as Appellant could present no evidence of Respondents' knowledge of prior abuse, he, "after an adequate period of discovery,…has not and cannot satisfy [all] essential elements of his claim for intentional failure to supervise."

---

[6] Section 317 of the Restatement (Second) of Torts provides:
   A master is under a duty to exercise reasonable care so to control his servant while acting outside the scope of his employment as to prevent him from intentionally harming others or from so conducting himself as to create an unreasonable risk of bodily harm to them, if
       (a) the servant
           (i)   is upon the premises in possession of the master or upon which the servant is privileged to enter only as his servant, or
           (ii)  is using a chattel of the master, and
       (b) the master
           (i)   knows or has reason to know that he has the ability to control his servant, and
           (ii)  knows or should know of the necessity and opportunity for exercising such control.

10

In response, Appellant argued, first, that in relying solely on Appellant's deposition testimony, Respondents "failed to present any undisputed material fact on the issue" of their prior knowledge because "[t]hat a witness said something in a deposition is not a material fact." Appellant further argued that, while he did not dispute that he, personally had no information as to Respondents' prior knowledge, a genuine issue did exist as to that fact based upon the remainder of the summary judgment record. In so arguing, Appellant relied on several documents from the Marianists' personnel records for Bro. Woulfe, asserting that the language therein evidenced Respondents' knowledge of Bro. Woulfe's history of sexual abuse. These materials included a letter to Bro. Woulfe dated July 1, 1968 from Brother James F. Gray ("Bro. Gray"), the Director of Education for the St. Louis Province, discussing Bro. Woulfe's transfer to Chaminade from another Marianist high school, which states in part:

> I am sorry that things did not work out more appropriately at St. Boniface. At the same time…the actual grace left by this unusual situation may be one which helps you to confront and overcome the problem which, if left untended, would eventually become a serious one for religious life: that our obligations of religious observance and exercises, while not to be fulfilled mechanicalistically…, due [sic] remain fundamental obligations and if our observance of them fails generally or regularly, it cannot but help undermine our entire commitment to religious life.

Additionally, in a May 19, 1970 letter to Bro. Woulfe following an initial decision by the Marianists to transfer him away from Chaminade, a decision they later reversed, Bro. Gray apologized "for the unfortunate circumstances connected with the change itself to a certain degree and the manner in which you were bomb-shelled, so to speak, with it."

In a July 22, 1970 letter protesting the Marianists' decision to transfer him, Bro. Woulfe provided, "I have been doing an excellent job and now for no apparent reason, my services are no longer desired at Chaminade…I have had my Faith rudely shaken. I have always admitted that I did not live faithfully day to day the externals of Religious Life."

11

Moreover, in a July 28, 1970 letter informing Bro. Woulfe of the reversal of the Marianists' decision to transfer him, Bro. Gray wrote:

With considerable misgivings and reservations, the Provincial Council…decided that you shall stay on at Chaminade for this coming year. Many of the same arguments you used about Chaminade's need for an excellent Guidance program as the basis of your staying on there were the very concerns behind Chaminade's Administration's attempt to improve the Guidance situation with a new man who, they hoped might patch up some of the professional lacks they found in the program you have developed up to this point.

In turn, evaluations of Bro. Woulfe contained in Provincial Council minutes from November 18, 1976 through April 12, 1977 discuss his deficiencies in "religious life." In the November 18, 1976 minutes, the notation provides that Bro. Woulfe "has not improved in the religious life aspects" and that "it is now becoming a school problem because of some professional negligence on his part[, in that he] has taken to showing up at ten in the morning." The February 4, 1977 minutes provide that:

the local decision has been made by the Director and the Principal that [Bro. Woulfe] should move…The community does not know many of the facts, and some are taking the side of [Bro. Woulfe]. [Bro. Woulfe] does not face the problems of prayer, religious life, and his personal problems.

Appellant also cited Fr. Hakenewerth's deposition, wherein he testified that in the "spring of '77" he learned of a student's complaint that Bro. Woulfe made sexual advances toward him and that he "removed [Bro. Woulfe] from the…residence, the dormitory" on the evening he learned of the complaint.

Beyond the personnel file materials, Appellant also relied upon the expert opinion of Fr. Doyle, reached in a companion case against Respondents, which constituted the strongest support for his argument regarding prior notice and provided that Respondents knew of Bro. Woulfe's history of abuse before he abused Appellant. Appellant filed Fr. Doyle's report and

deposition transcript from that case as supporting documents. In his report, Fr. Doyle noted that he was ordained a Catholic priest in the Dominican Order in 1970 and, among other work he conducts, is a Canon lawyer. Fr. Doyle provided that he first became involved with sexual abuse by Catholic clergy in 1982 while serving as a Canon lawyer at the Vatican embassy, and that he has studied documentation in cases from 190 of 195 Catholic dioceses in the United States. Moreover, he explained that Fr. Doyle has "been directly involved with and studied documentation and personnel files from several religious orders with foundations in the United States," having reviewed approximately 2,000 priest personnel files.

In his report, Fr. Doyle concluded that Respondents knew of Bro. Woulfe's history of abuse in 1968, as evidenced in the July 1, 1968 letter from Bro. Gray. He contended that, although not directly addressed therein, he believed that the language used, which expressed Bro. Gray's regret that "things did not work out more appropriately at St. Boniface," that an "unusual situation" existed, and that Bro. Woulfe faced a "problem which, if left untended, would eventually become a serious one for religious life" "refers to [] sexual activity" because "it is written in the euphemistic or coded language that has been and continues to be commonly used by Catholic bishops, religious superiors and other clerics, when referring to sexual abuse with minors." He further explained that "[a]t this point,…[u]nless I receive other information down the line that either reinforces…or negates it," the use of the phrase "with considerable misgivings and reservations" in the July 28, 1970 letter detailing the Marianists' reversal of its decision to transfer Bro. Woulfe from Chaminade "leads me to the opinion that this attempted or threatened move was based on knowledge of sexual abuse." Additionally, he noted that, in his opinion, "given the number of students who reported sexual abuse by [Bro.] Woulfe in the seventies, this activity was known to...most or all of the Marianists on the school staff."

13

In the transcript of Fr. Doyle's deposition, Fr. Doyle agreed that he "intend[ed] to offer an opinion about what…[Bro.] Gray…meant to convey" in his July 1, 1968 letter to Bro. Woulfe, drawing on his experience in "Canon law, 34 years of direct experience in dealing with sexual abuse by clerics, ecclesiastical structures,…[and] structures of religious communities." He testified that he has seen "the use…of euphemistic language" "so many times in documentation and correspondence[, although] [n]ot in connection with any specific case." Fr. Doyle added, "a lot of it has to do with even memories from time in—in the seminaries how sexuality was discussed or not discussed, how it's phrased in the seminary, the books that were used in seminaries, the textbooks and so on." Fr. Doyle further explained that "[i]n the documentation that is habitually used by religious superiors and bishops and other clerics that [he has] reviewed over three decades, [he has] never seen sexual abuse of minors directly referred to with the proper direct language," as it is "always referred to in some form of coded or euphemistic language." Fr. Doyle provided no testimony as to the form in which the previously-encountered "coded or euphemistic language" took. Nor did Fr. Doyle testify as to any words or phrases he encountered in his experience that specifically meant "sexual abuse" or "sexual contact with a minor." Fr. Doyle noted that he has "[n]ever" published "anything related to euphemistic language or code words related to sex abuse," and he explained that he did not use or reference in his report any documentation on the subject of code words used to describe sexual abuse.

Fr. Doyle also acknowledged that "religious life" might refer to "observance of the vows" and adhering to religious obligations such as daily mass and daily prayer. Fr. Doyle further agreed that documents in Bro. Woulfe's personnel file note that he had "an issue going to mass and observing daily prayers on a regular basis," but asserted that the July 1, 1968 letter's reference to "religious life" did not refer to those issues, as they were addressed directly in other

14

documents in the file. Nevertheless, when asked how he could know that the letter did not refer to Bro. Woulfe's religious life as it related to his deficiencies in attending mass and observing daily prayers on a regular basis, Fr. Doyle responded, "I don't know. I'm not sure, but my opinion is it doesn't." Additionally, Fr. Doyle admitted that he did not have "metaphysical certitude" that the 1968 letter refers to sexual abuse and agreed that he is "not ever going to know for certain what [Bro.] Gray intended to convey in [his] letter," which is "why [he] consider[s] [his conclusion] an opinion."

In rejecting Appellant's reliance on Fr. Doyle's interpretation of the personnel file materials and granting summary judgment, the trial court noted that it could "discern no *competent* evidence in the record, including but not limited to the deposition testimony of [Fr. Doyle]" from which a conclusion that Respondents knew of Bro. Woulfe's history of sexual abuse "could be reached without repeated speculation and reliance on hearsay, even when viewed in the light most favorable to [Appellant]."

On appeal, Appellant first argues that because Respondents relied on Appellant's deposition testimony that he, personally, had no information of Respondents' knowledge of Bro. Woulfe's history of abuse, they failed to raise an issue of material fact because "[t]hat a witness said something in a deposition is not a material fact," but rather only a claim "about what [Appellant] said in his deposition." He asserts, therefore, that summary judgment was unwarranted. Appellant, however, disregards the standard under which a movant can establish a prima facie case for summary judgment. A movant may show "*any* of" three grounds to establish a prima facie case including, under the second ground, by showing that the non-movant, following discovery, "has not been able to produce, and will not be able to produce, evidence

15

sufficient to allow the trier of fact to find the existence of any one of the claimant's elements." Custer v. Wal-Mart Stores East I, LP, 492 S.W.3d 212, 218 (Mo. App. S.D. 2016).

Here, Respondents "clearly chose to proceed under the second method for a defending party to establish summary judgment by arguing that [Appellant] had not been able to produce evidence" of Respondents' prior knowledge of Bro. Woulfe's abuse. Id. at 219. "The issue[,]…therefore, is whether [Appellant] produced substantial evidence to establish a genuine issue" as to Respondents' prior knowledge. Id.

As such, Appellant next argues that, based upon the language used in the letters in Bro. Woulfe's personnel file, Fr. Doyle's expert opinion, and the use of "similar language" in the personnel evaluations from 1976 and 1977, a jury could "conclude that [Respondents] were aware of [Bro. Woulfe's]" prior assaults.

"Only evidentiary materials that are admissible or usable at trial can sustain or avoid a summary judgment." American Family Mut. Ins. Co. v. Lacy, 825 S.W.2d 306, 311 (Mo. App. E.D. 1991). The admissibility of expert opinion testimony is governed by Section 490.065.2, which states, in relevant part:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>    (a) The expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>    (b) The testimony is based on sufficient facts or data;
>    (c) The testimony is the product of reliable principles and methods; and
>    (d) The expert has reliably applied the principles and methods to the facts of the case.

Section 490.065.2(1). "[E]xpert testimony is admissible as long as the expert's competence on the subject matter is superior to that of the ordinary juror and the expert's opinion aids the jury in deciding an issue in the case." Potter v. Hy-Vee, Inc., 560 S.W.3d 598, 606 (Mo. App. S.D. 2018) (quoting Freight House Lofts Condo Ass'n v. VSI Meter Services, Inc., 402 S.W.3d 586,

16

596 (Mo. App. W.D. 2013)). Generally, questions as to the sources and bases of an expert's opinion "affect the weight, rather than the admissibility, of the opinion." Glaize Creek Sewer Dist. of Jefferson County v. Gorham, 335 S.W.3d 590, 594 (Mo. App. E.D. 2011). Even so, "an expert's opinion still 'must be founded on substantial information, not mere conjecture or speculation, and there must be a rational basis for the opinion.'" Id. (quoting Doe v. McFarlane, 207 S.W.3d 52, 62 (Mo. App. E.D. 2006)). Accordingly, "if an expert witness is called, the facts in evidence, coupled with those available to the witness from the witness's own investigation, must be sufficient to take the expert testimony out of the realm of guesswork." Brown for Estate of Kruse v. Seven Trails Investors, LLC, 456 S.W.3d 864, 873-74 (Mo. App. E.D. 2014) (quoting Mueller v. Bauer, 54 S.W.3d 652, 658 (Mo. App. E.D. 2001)). "If an expert's opinion is premised on such guesswork or is mere conjecture or imagination, then it is insufficient to demonstrate a genuine issue of material fact necessary to avoid summary judgment." Id. In other words, "[e]xpert opinions founded on speculation are not sufficient to raise disputed issues of fact." Frontenac Bank v. T.R. Hughes, Inc., 404 S.W.3d 272, 279 (Mo. App. E.D. 2012) (quoting Neiswonger v. Margulis, 203 S.W.3d 754, 759 (Mo. App. E.D. 2006)).

"As to the state of mind of another, it is one thing to testify to such other's words or conduct which reveal his state of mind as to such things as motive, intent, knowledge, etc. and quite another thing to testify as to the effect of such behavior and statements on the mind of the witness to lead him to a conclusion as to the mind of the other party." American Family Mut. Ins. Co., 825 S.W.2d at 312 (quoting 1 S. Gard, Missouri Evidence Sec. 5:17 (1985)); see also Delacroix v. Doncasters, Inc., 407 S.W.3d 13, 49-50 (Mo. App. E.D. 2013) (en banc) (Ahrens, J. concurring in part and dissenting in part) ("Although the experts were prompted by counsel to utter the words 'actual knowledge,' logic dictates that, in reality, the experts were either

17

speculating on Doncasters' state of mind, which is improper and inadmissible (but presented here without objection), or opining as to what Doncasters *should have known* based on the tests, which didn't identify the specific defect."). "It is well established that witnesses are incompetent to testify as to the intentions of other parties. A witness's 'attempt to state what was in someone else's mind is either sheer speculation or unadulterated hearsay.'" Bryant, 400 S.W.3d at 333 (quoting Uhle v. Sachs Electric, 931 S.W.2d 774, 777 (Mo. App. E.D. 1992)).

On this record, we find that the trial court properly disregarded Fr. Doyle's opinion when determining that Appellant failed to raise genuine issue as to Respondents' knowledge of Bro. Woulfe's history of sexual abuse. We find Bryant v. Bryan Cave, LLP instructive in helping us conclude that Appellant's evidence was speculative. In Bryant, a husband sued his attorney for legal malpractice, alleging that he was negligent in preparing an antenuptial agreement which provided that the wife, upon divorce, would receive payment from the husband equal to 25% of a valuation of his separate property, marital property and liability, and gifts from the wife to him, but did not include a provision deducting any capital gains tax liability on his property from the valuation of his assets. Id. at 328-29. He asserted that, after filing a petition for dissolution of marriage, the trial court refused to reduce the valuation of his property accordingly, given the absence of a capital gains provision in the agreement, and ordered him to pay the wife $22.8 million over nine years. Id. at 329. The attorney and his firm filed a motion for summary judgment, arguing that the husband could present no evidence that the attorney's negotiation of the antenuptial agreement caused his damages because he could not prove that, but for the attorney's negligence, the wife would have agreed to a capital gains provision in the agreement. Id. at 330. The trial court agreed and entered summary judgment for the attorney and firm. Id. The husband appealed, arguing, first, that he presented evidence that the wife acquiesced to

18

several other provisions in the agreement, such that she likely would have agreed to the capital gains provision, and second, that opinion testimony from two family law experts that she would have agreed to the provision established such causation. Id. at 331-34.

In affirming the grant of summary judgment, this Court found that the evidence relied upon by the husband was speculative. Id. at 332, 335. We reasoned that, as to evidence that the wife had agreed to other provisions in the agreement, a conclusion that the attorney's negligence caused his damages was too attenuated because such evidence was not probative "as to whether [the wife] would agree to specific, unrelated contractual provisions at some future date" and required "the impermissible piling of inference upon inference that results in rank speculation." Id. at 332. As to the family law experts' opinions that the wife would have accepted a capital gains provision, we reasoned that their family law experience provided them no "scientific, technical, or specialized knowledge helpful in predicting whether…[the wife] would have agreed to such provisions had they been presented to her." Id. at 335-36. Instead, their opinions were the product of "nothing more than [] general experience of how people make decisions, an area in which a jury is as capable as [the experts] in drawing its own conclusion" and speculation that was inadmissible at trial. Id. We thus concluded that the opinion evidence failed to create a genuine issue of fact as to causation. Id. at 336.

Here, relying on the reasoning in Bryant, we find that Fr. Doyle's expert opinion that Respondents knew of Fr. Doyle's history of sexual abuse in 1968 prior to Appellant's own abuse was likewise speculative. Fr. Doyle's expertise in Canon law, dealing with sexual abuse by clerics, ecclesiastical structures, and structures of religious communities stops there. This experience, though substantial, provides him with no specialized knowledge that allows him to know what was in Respondents' minds or what particular knowledge they possessed in 1968 or

19

1977 absent a direct reference to sexual abuse in the materials he relied upon. While Fr. Doyle asserts that his conclusion is supported by Respondents' use of phrases such as "religious life," "considerable misgivings," and "problems," in the documents he reviewed, his conclusion relies upon the assumption that Respondents intended to convey a message about sexual abuse by using these terms. By Fr. Doyle's own admission, however, he "do[es]n't have metaphysical certitude" that the phrases at issue referred to sexual abuse, and he could not be sure that they did not actually refer to issues regarding "going to mass and observing daily prayers on a regular basis," which he conceded were issues Bro. Woulfe did face. In intimating that, by using these terms, Respondents were conveying a message about Bro. Woulfe's history of sexual abuse, therefore, Fr. Doyle necessarily engaged in guesswork in divining Respondents' state of mind and their intentions for using the language they did. Accordingly, Fr. Doyle's opinion that Respondents knew of Bro. Woulfe's history of sexual abuse in 1968 is founded on "sheer speculation," and inadmissible. Id. at 333, 335-36.

Appellant counters that knowledge may be established through circumstantial evidence in the summary judgment record. He argues that because the Provincial Council evaluations of Bro. Woulfe in 1976 and 1977, which coincided with Bro. Woulfe's removal from Chaminade in 1977 after Fr. Hakenewerth learned that a student accused him of making sexual advances, used language such as "problems" and "religious life," and because the July 1, 1968 letter used similar language in noting that "this unusual situation may…eventually become a serious one for religious life," Respondents likely had knowledge of Bro. Woulfe's history of abuse in 1968. Appellant is correct that knowledge can be proved by circumstantial evidence. Scholdberg v. Scholdberg, 578 S.W.3d 831, 839 (Mo. App. W.D. 2019). However, "the circumstances must be such that the necessary fact may be inferred therefrom and must reasonably follow, so that the

conclusion so reached is not the result of guesswork, conjecture or speculation, and such evidence must 'have a tendency' to exclude every other reasonable conclusion." Herman v. Daffin, 302 S.W.2d 313, 316 (Mo. App. 1957) (quoting Duggan v. Rippee, 278 S.W.2d 812, 815 (Mo. App. 1955)). "It is not enough that the evidence may be merely consistent with the desired conclusion." Duggan, 278 S.W.2d at 815-16.

Here, Fr. Doyle's reliance upon language in the 1976 and 1977 evaluations to reach his conclusion that Respondents had knowledge of Bro. Woulfe's history of abuse in 1968 suffers from the same logical flaw as noted above. Although Fr. Hakenewerth confirmed that Bro. Woulfe was removed from Chaminade in 1977 following a student's accusation that Bro. Woulfe was making sexual advances toward him, no direct connection between the language used in the 1976 and 1977 evaluations and sexual abuse was established. Fr. Doyle gave no testimony that the terms "problems" and "religious life" were code words that specifically referred to "sexual abuse" or "sexual contact with minors." To the contrary, he admitted that these terms could have referred to Bro. Woulfe's deficiencies in "observance of the vows" and adherence to religious obligations like daily mass and prayer. Thus, absent a direct reference to sexual abuse in the 1976 and 1977 evaluations, Fr. Doyle's assumption that, by using terms such as "problems" and "religious life," Respondents sought to convey a message about sexual abuse, is premised upon his guesswork as to Respondents' intentions. His conclusion that the lack of a direct reference to sexual abuse in the evaluations and the July 1, 1968 letter coupled with similarities in the language of those documents evidence Respondents' prior knowledge of abuse is too attenuated from the evidence in the record, as it requires "the impermissible piling of inference upon inference that results in rank speculation." Bryant, 400 S.W.3d at 332; see also, Scholdberg, 578 S.W.3d at 837-39 (plaintiff in premises liability action could not establish genuine issue as to

21

defendant's actual knowledge of weakened brackets on top of railing that gave way by arguing that he had knowledge of weakened brackets on *bottom* of railing which were made of same construction because such evidence would only permit fact finder to infer that defendant *should* have known of weakened top brackets, not actual knowledge). "A non-movant who relies only upon mere doubt and speculation in its response to the motion for summary judgment fails to raise any issue of material fact." Holzhausen v. Bi-State Development Agency, 414 S.W.3d 488, 493 (Mo. App. E.D. 2013).

Accordingly, Fr. Doyle's opinion would have been inadmissible as speculative and cannot assist Appellant's efforts to avoid summary judgment. Absent his opinion, the summary judgment record is left with documents prepared by Respondents which use language referring to Bro. Woulfe's "problems" in his "religious life." The documents do not directly reference Bro. Woulfe's history of sexual abuse, and no competent evidence exists in the summary judgment record to "decode" these terms as references to sexual abuse. Thus, even when viewed in the light most favorable to Appellant, the record contains no competent evidence that Respondents had knowledge of Bro. Woulfe's history of abuse in 1971 when Appellant suffered his abuse. As a result, Appellant failed to establish the existence of a genuine issue related to Respondents' knowledge. The trial court did not err in granting summary judgment in favor of Respondents on Appellant's claim of intentional failure to supervise clergy. Points II and III are denied.

<u>Statute of Limitations</u>

In Point IV, Appellant argues that, in declining to consider the statute of limitations issue raised by the parties, the trial court "erred by not denying summary judgment based on the five-year statute of limitations" provided under Section 516.120(4). He argues that because the record established that his memory was repressed until 2012, his cause of action did not accrue until

that time, pursuant to Section 516.100[7] as interpreted by Powel v. Chaminade College Preparatory, Inc., 197 S.W.3d 576 (Mo. banc 2006)[8]. He asserts, therefore, that the trial court should have denied summary judgment in Respondents' favor because the November 4, 2015 filing of his lawsuit was within the five-year statute of limitations.

While Appellant is correct that the trial court declined to consider the statute of limitations issue raised by the parties, he is warranted no relief. First, "[w]hen reviewing a grant of summary judgment, we are required to sustain the trial court's order if the judgment is sustainable under any theory." Flavan v. Cundiff, 83 S.W.3d 18, 27 (Mo. App. E.D. 2002); see also, Doe, 481 S.W.3d at 41 ("We will affirm the grant of summary judgment on any basis supported by the record, whether or not relied upon by the trial court."). Here, we have found that the trial court's grant of summary judgment was proper because his negligence claims were precluded by Gibson and no genuine issue existed regarding Respondents' knowledge so as to sustain his intentional failure to supervise clergy claim. Second, Rule 84.04 requires appellants to include with each point relied on "a list of cases…and the constitutional, statutory, and regulatory provisions or other authority upon which that party principally relies." Rule 84.04(d)(5). "If an appellant neither cites to authority nor explains its failure to do so, then the

---

[7] Section 516.100 provides:

> Civil actions, other than those for the recovery of real property, can only be commenced within the periods prescribed in the following sections, after the causes of action shall have accrued; provided, that for the purposes of sections 516.100 to 516.370, the cause of action shall not be deemed to accrue when the wrong is done or the technical breach of contract or duty occurs, but when the damage resulting therefrom is sustained and is capable of ascertainment, and, if more than one item of damage, then the last item, so that all resulting damage may be recovered, and full and complete relief obtained.

[8] In Powel, the Missouri Supreme Court provided that for statute of limitations purposes, the "capable of ascertainment test is an objective one," determined at the time "when a reasonable person would have been put on notice that an injury and substantial damages may have occurred and would have undertaken to ascertain the extent of the damages." 197 S.W.3d at 584. The Court thus noted, "If the memory of the wrong was repressed before the victim had notice both that a wrong had occurred and that substantial damage had resulted, or before the victim knew sufficient facts to be put on notice of the need to inquire further as to these matters, then the claim would not yet have accrued at the time that the victim repressed his or her memory of the events." Id.

appellant is deemed to have abandoned that point." <u>Flavan</u>, 83 S.W.3d at 28. Here, although Appellant claims the trial court should have considered the parties' statute of limitations arguments and denied Respondents' Motion on that issue, he "failed to cite any authority to support his argument that a failure to address all the arguments in a motion for opposition to summary judgment constitutes grounds for reversal." <u>Id</u>. at 27. Finally, Appellant failed to demonstrate how a denial of summary judgment on statute of limitation grounds "would have precipitated a different result in the underlying action." <u>Id</u>. Even assuming, without deciding, that the trial court should have considered and denied the parties' statute of limitations arguments relating to Appellant's negligence claims and his intentional failure to supervise clergy claim, we have nevertheless determined, as outlined above, that summary judgment on those claims was proper.

Because we may affirm the grant of summary judgment on any basis supported by the record, and because Appellant failed to provide authority instructive on his argument that the trial court should have considered his statute of limitations arguments, we find that the trial court did not err in granting summary judgment. Point IV is denied.

Conclusion

We would affirm the Judgment of the trial court, but due to the general interest and importance of the issues on appeal, we transfer the case to the Supreme Court of Missouri pursuant to Rule 83.02.

_____
Mary K. Hoff, Presiding Judge

Sherri B. Sullivan, J., concurs and
Angela T. Quigless, J., dissents in separate opinion.

24



# In the Missouri Court of Appeals
## Eastern District
### DIVISION THREE

JOHN DOE 122,                                   )          No. ED107767
                                                )
                    Appellant,                  )          Appeal from the Circuit Court
                                                )          of St. Louis County
vs.                                             )          15SL-CC03799
                                                )
MARIANIST PROVINCE OF THE                       )           Honorable Kristine Allen Kerr
UNITED STATES and CHAMINADE                     )
COLLEGE PREPARATORY, INC.,                      )
                                                )
                    Respondents,                )
                                                )
and                                             )
                                                )
FR. MARTIN SOLMA,                               )
                                                )
                    Defendant.                  )          Filed: December 31, 2019

### DISSENT

I respectfully dissent in part. While I concur with the majority in affirming the grant of

summary judgment in favor of the respondents regarding the appellant's negligence claims, I

believe the record is sufficient to defeat the respondents' motion for summary judgment on the

claim of intentional failure to supervise clergy because a genuine issue exists as to the material

fact of the respondents' knowledge. "For purposes of summary judgment, a 'genuine issue'

exists where the record contains competent materials that evidence two plausible, but

contradictory, accounts of the essential facts." *Blackwell Motors, Inc. v. Manheim Servs. Corp.*,

529 S.W.3d 367, 373 (Mo. App. E.D. 2017). We have such a dispute here.

The parties do not dispute what actions the respondents took in the late 1960s through the mid-1970s with regard to Bro. Woulfe. The real dispute lies in the interpretation of those actions, and thus whether the respondents knew of, and concealed, allegations that Bro. Woulfe had sexually abused children before the appellant contends he was abused.

> [T]he rule that we give the non-movant the benefit of all reasonable inferences means that if the movant requires an inference to establish the right to judgment as a matter of law, and the evidence reasonably supports any inference other than, or in addition to, the movant's inference, a genuine dispute exists, and the movant's prima facie case fails.

*Robinson v. Lagenbach,* 439 S.W.3d 853, 860-61 (Mo. App. E.D. 2014) (quoting *Cardinal Partners, LLC v. Desco Investment Co., L.L.C.,* 301 S.W.3d 104, 109 (Mo. App. E.D. 2010)).

The appellant alleges that Bro. Woulfe sexually abused him in 1971 while the appellant was a high-school senior at Chaminade. Bro. Woulfe was ultimately removed from Chaminade in 1977 because of allegations of sexual abuse as Fr. Hakenewerth admitted in his deposition. The key issue, therefore, is whether the respondents knew about Bro. Woulfe's alleged abuse of children before the appellant contends he suffered abuse in 1971, and whether this presents a material question of fact that renders improper summary judgment in favor of the respondents on the claim of intentional failure to supervise clergy.

It is true that nowhere in his deposition does Fr. Doyle testify that the terms "religious life" or "problems" or "personal problems" are well-established, recognized code words that specifically mean sexual abuse of children. I agree it would be impermissibly speculative to have Fr. Doyle testify that Bro. Gray meant sexual abuse of children when he wrote his 1968 and 1970 letters to Bro. Woulfe. It would not be impermissible speculation, however, for Fr. Doyle to testify regarding the pattern of excluding any direct reference to child sexual abuse that he observed in his 30-plus years of reviewing the files of hundreds of perpetrators of child sexual

2

abuse in the Catholic Church. It would not be impermissible speculation for Fr. Doyle to testify that he has *never* seen sexual abuse of children explicitly stated. As Fr. Doyle explained:

> In the documentation that is habitually used by religious superiors and bishops and other clerics that I've reviewed over three decades, they never—I've never seen sexual abuse of minors directly referred to with the proper direct language.
> It's always referred to in some form of coded or euphemistic language that is covering up or . . . or masking what the reality is . . . .

Fr. Doyle went on to explain that problems of "alcohol abuse, absence from community meals, spiritual exercises, or relationships with women" are generally addressed explicitly in the files he has reviewed. "[I]f there's documentation, memos, if there had been letters referring to those issues such as there are here with regard to community life, there—there's no euphemistic language. . . . It's—It's pretty clear that you know what they're talking about." Fr. Doyle repeatedly explained that based on the language used in Bro. Woulfe's file that he believed the respondents knew of Bro. Woulfe's history of sexual abuse prior to the time the appellant contends he suffered abuse.

The evidence regarding Bro. Woulfe along with Fr. Doyle's testimony regarding the habitual use of language excluding direct references to child sexual abuse creates a genuine dispute of material fact that the appellant has the right to have the jury determine. Rather than deeming all of Fr. Doyle's testimony as merely speculative, the jury should be allowed to consider, weigh, and determine the meaning of the following evidence regarding Bro. Woulfe along with Fr. Doyle's testimony about his research and experience.

In a letter dated July 1, 1968, Bro. Gray wrote to Bro. Woulfe concerning Bro. Woulfe's departure from St. Boniface:

> I am sorry that things did not work out more appropriately at St. Boniface. At the same time . . . the actual grace left by this *unusual situation* may be one which helps you to confront and overcome *the problem*, which if left untended, would eventually become a *serious one for religious life* . . . .

3

(Emphases added). While the majority believes this language is speculative and can reference many things, Fr. Doyle testified that "not going to mass or not going to daily prayers is very common in religious orders. . . . [I]t's not an unusual situation, and it's not something that would eventually become a serious one for religious life." In addition, Fr. Doyle testified from his review of Bro. Woulfe's personnel file that failure to attend mass and the like was explicitly addressed. Bro. Woulfe was directly confronted about spiritual and community exercises many times. Thus, a reasonable inference exists that "the problem" cited in the 1968 letter referenced something other than spiritual exercises. Further, in Fr. Doyle's "experience in reviewing several hundred personnel files of clergy perpetrators [he has] found that problems such as alcohol abuse, absence from community meals, spiritual exercises, or relationships with women are addressed directly" while he has never seen sexual abuse of minors directly referenced. These facts give rise to a reasonable inference that Bro. Gray's 1968 letter was not referring to spiritual and community exercises when it refers to "the problem" "becom[ing] a serious one for religious life." While Fr. Doyle did not state that "religious life" specifically is an established code term or euphemism for sexual abuse of minors, Fr. Hakenewerth testified that "religious life" includes observance of the vow of chastity.

Missing from Bro. Woulfe's personnel file is the initial letter informing Bro. Woulfe that he was to be removed from Chaminade in 1970. Fr. Doyle opined that it is "significant" that no letter informing Bro. Woulfe of his upcoming transfer from Chaminade and the reason therefor was contained in the file. He stated that generally a man in a religious order is informed of the reasons for his transfer. Bro. Gray's letter of July 28, 1970 informs Bro. Woulfe that he would remain at Chaminade for the upcoming school year—the year that the appellant alleges he suffered abuse—despite the Provincial Council's unnamed "considerable misgivings and

4

reservations." Also missing from Bro. Woulfe's personnel file was any reference to allegations of sexual abuse as the reason for his removal from Chaminade in 1977.

Yet we know from undisputed facts that Bro. Woulfe was removed from Chaminade in 1977 because of an allegation of sexual abuse of a student. Bro. Woulfe thereafter received a dispensation from Rome to leave the Marianist order. Fr. Hakenewerth testified in his deposition that he did not mention the sexual-abuse allegation in his petition to the pope for Bro. Woulfe's dispensation, instead referring to difficulties with "religious life." The exclusion of an explicit reference to allegations of sexual abuse of children in Bro. Gray's 1968 and 1970 letters is consistent with a pattern of excluding such references. Likewise, this exclusion supports Fr. Doyle's contention that there exists a pattern of not specifically documenting sexual abuse of children, and that sexual abuse is always referenced in some form of code or euphemistic language.

Reported sexual abuse of children was not referenced in Bro. Woulfe's records even when the respondents admit having knowledge of alleged abuse. Rather, respondents refer to "religious life." This evidence, in conjunction with the language contained in Bro. Gray's letters, and Fr. Doyle's experience with hundreds of cases of child sexual abuse with no direct reference to such abuse supports a reasonable inference that there existed a pattern of exclusion to conceal the respondents' prior knowledge of sexual abuse of children. This is not piling of inference upon inference that results in rank speculation as the majority asserts. Rather, the evidence presents two plausible, but contradictory, accounts. As a result, the jury should be able to consider these facts, weigh the evidence, and reach a conclusion as to whether the pattern of exclusion of direct reference to child sexual abuse constitutes sufficient evidence of the respondents' prior knowledge.

5

While the pattern of excluding direct sexual-abuse references constitutes circumstantial evidence, knowledge is virtually always proven by circumstantial evidence. "Proof of a party's knowledge is similar to proof of such elusive facts as intent, motive, undue influence, mental capacity, and the like. Summary judgment is rarely appropriate in these types of cases in which the facts must in nearly every case be proven by circumstantial evidence." *Wagner v. Uffman*, 885 S.W.2d 783, 787 (Mo. App. E.D. 1994). When such circumstantial evidence is present, the non-movant's failure in the summary-judgment context to provide direct evidence of a party's intent, knowledge, motive, or the like is an improper basis for judgment. *Id*. The pattern of excluding direct sexual-abuse references constitutes competent evidence sufficient to raise a genuine issue of material fact concerning the respondents' prior knowledge that can overcome summary judgment and should be considered by the jury.

A fine distinction exists between speculation about what Bro. Gray meant in his letters to Bro. Woulfe versus Fr. Doyle's testimony about his decades of experience reviewing hundreds of perpetrator files and the significance of Fr. Doyle's findings in light of the facts of Bro. Woulfe's situation. Nonetheless, if we label as speculative the evidence about Fr. Doyle's experience and findings in the same manner as we label as speculative the evidence about what Bro. Gray meant, it seems that no plaintiff would ever be able to prove that a defendant had the requisite knowledge of wrongdoing unless the defendant admits to having such knowledge, which is unlikely.

For these reasons, I would reverse the trial court's grant of summary judgment in favor of the respondents on the claim of intentional failure to supervise clergy.

_____
Angela T. Quigless, Judge

6